DA 11-0723

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2013 MT 130

STATE OF MONTANA,

       Plaintiff and Appellant,

  v.

BARRY ALLAN BEACH,

       Defendant and Appellee.

APPEAL FROM:    District Court of the Fifteenth Judicial District,
In and For the County of Roosevelt, Cause No. 1068-C
Honorable E. Wayne Phillips, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Timothy C. Fox, Montana Attorney General; Tammy K Plubell, Assistant
Attorney General; Helena, Montana

      For Appellee:

          Terrance Lee Toavs; Law Offices of Terrance L. Toavs; Wolf Point,
Montana

          Peter K. Camiel; Mair & Camiel, P.S.; Seattle, Washington

                      Submitted on Briefs:   August 29, 2012

                                Decided:   May 14, 2013

Filed:

               _____
                            Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1    The State of Montana appeals from the order of the Fifteenth Judicial District Court, Roosevelt County, granting Barry Allen Beach (Beach) a new trial in the matter of the homicide of Kim Nees (Nees).  We reverse the District Court, and address this issue:

¶2    *Did the District Court err by concluding that Beach was entitled to a new trial because he had demonstrated his actual innocence?*

## PROCEDURAL BACKGROUND

¶3    In the early morning hours of June 16, 1979, police officers of the Fort Peck Tribe discovered Nees's body floating in the Poplar River.  She had been bludgeoned to death.  On January 7, 1983, Beach confessed to killing Nees, and, on April 13, 1984, a jury convicted him of deliberate homicide.  The court sentenced Beach to 100 years in the Montana State Prison without the possibility of parole.

¶4    Beach has challenged his conviction in the courts and applied for clemency.  In 1985, Beach appealed to this Court.  We upheld his conviction and sentence.  *State v. Beach*, 217 Mont. 132, 705 P.2d 94 (1985).  In 1995, Beach filed a petition for postconviction relief.  We dismissed Beach's petition because it had been filed beyond the five-year statutory limitation period, and Beach did not submit new evidence establishing that he did not kill Nees.  *Beach v. Day*, 275 Mont. 370, 913 P.2d 622 (1996).  Beach then filed a petition for habeas corpus in federal court, asserting his actual innocence.  United States Magistrate Judge Anderson recommended that Beach's petition be denied because Beach was procedurally barred from presenting his constitutional

2

claims, and his "presentation of 'new evidence' d[id] not warrant a finding of actual innocence as an exception to the procedural bar." *Beach v. Mahoney*, CV-92-92-BLG-RWA (D. Mont. Aug. 6, 1997). Federal District Court Judge Shanstrom agreed with Judge Anderson and denied Beach's petition, holding that Beach's evidence was insufficient "to warrant a finding of actual innocence . . . ." *Beach v. Mahoney*, CR 92-92-BLG-JDS (D. Mont. Mar. 31, 1998). The Ninth Circuit affirmed. *Beach v. McCormick*, 191 F.3d 459 (9th Cir. 1999) (table). In 2005, Beach filed an application for executive clemency with the Montana Board of Pardons and Parole (the Board). The Board denied Beach's application because he had "not satisfactorily proven [his] innocence of the crime or submitted newly discovered *evidence* showing complete justification or non-guilt." (Emphasis in original.) In 2006, Beach submitted an application to Governor Brian Schweitzer who referred it back to the Board. A three-member panel (the Clemency Panel) of the Board held a three-day hearing to determine if Beach's new evidence established his "actual innocence." On August 20, 2007, the Clemency Panel denied Beach's application because "[n]o proof of innocence, or newly discovered evidence of non-guilt or justification ha[d] been presented."

¶5     In 2008, Beach filed another petition for postconviction relief in state district court, alleging that newly discovered evidence proved his actual innocence. The district court summarily denied Beach's petition in a one-page order. On appeal, we reversed and remanded for the district court to hold an evidentiary hearing on the newly

discovered evidence alleged in Beach's petition. *Beach v. State* (*Beach I*), 2009 MT 398, ¶ 51, 353 Mont. 411, 220 P.3d 667.

¶6    On remand, the District Court held a three-day hearing, and took testimony from witnesses that suggested a group of teenage girls had killed Nees. The District Court concluded that Beach had presented sufficient evidence of his "actual innocence" to warrant a new trial. The District Court subsequently released Beach from the Montana State Prison pending appeal.

¶7    The State appeals.

## STANDARD OF REVIEW

¶8    The standard of review of a district court's disposition of a petition for post-conviction relief is whether the district court's findings of fact are clearly erroneous and whether its conclusions of law are correct. *Griffin v. State*, 2003 MT 267, ¶ 7, 317 Mont. 457, 77 P.3d 545; *Porter v. State*, 2002 MT 319, ¶ 13, 313 Mont. 149, 60 P.3d 951. However, an actual innocence claim brought in a postconviction relief proceeding presents a unique posture for the reviewing court. The petitioner has been duly convicted—the State has introduced evidence sufficient for a jury to find the petitioner guilty beyond a reasonable doubt. Before overturning that verdict, the reviewing court must determine whether the petitioner has supported his innocence claim "with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324, 115 S. Ct. 851, 865 (1995); *accord Herrera v. Collins*, 506 U.S. 390,

4

417-18, 113 S. Ct. 853, 869-70 (1993). To determine if the evidence is "reliable," the reviewing court must analyze "whether the new evidence is trustworthy by considering it both on its own merits and . . . in light of the pre-existing evidence in the record." *Doe v. Menefee*, 391 F.3d 147, 161 (2d Cir. 2004) (Sotomayor, J.) (citing *Schlup*, 513 U.S. at 327-28, 115 S. Ct. at 867); *Herrera*, 506 U.S. at 418, 113 S. Ct. at 870; *State v. Redcrow*, 1999 MT 95, ¶ 37, 294 Mont. 252, 980 P.2d 622. The court must then combine the new *reliable* evidence with the old trial evidence and determine whether a reasonable jury presented with this hybrid record would find the petitioner guilty. *Herrera*, 506 U.S. at 418, 113 S. Ct. at 870; *Schlup*, 513 U.S. at 329, 115 S. Ct. at 868; *House v. Bell*, 547 U.S. 518, 538, 126 S. Ct. 2064, 2078 (2006); *Redcrow*, ¶ 37. Because the determination as to "whether no reasonable juror would find a petitioner guilty beyond a reasonable doubt is a mixed question of law and fact, we review the district court's ultimate finding of actual innocence *de novo*." *Menefee*, 391 F.3d at 163; *House*, 547 U.S. at 539-40, 126 S. Ct. at 2078.

**DISCUSSION**

¶9    As noted above, in 2008 Beach filed another petition for postconviction relief, alleging that newly discovered evidence demonstrated his "actual innocence." *Beach I*, ¶ 13. The postconviction statutes applicable to Beach's conviction required him to bring his claim within five years of his conviction. Section 46-21-102, MCA (1995); *Beach I*, ¶ 23. While there was no statutory exception to this time bar, we have recognized an equitable tolling of the time limit when "strict enforcement would result in a fundamental

5

miscarriage of justice." *Beach I*, ¶ 23; *State v. Perry*, 232 Mont. 455, 462, 758 P.2d 298, 273 (1988) (overruled on other grounds in *State v. Clark*, 2005 MT 330, ¶ 32, 330 Mont. 8, 125 P.3d 1099). The "fundamental miscarriage of justice" exception applies when the petitioner shows he is "actually innocent" of the crime for which he was convicted. *State v. Pope*, 2003 MT 330, ¶¶ 40-53, 318 Mont. 383, 80 P.3d 1232.

¶10 In *Beach I*, we cited the five-prong test outlined in *State v. Clark*, 2005 MT 330, 330 Mont. 8, 125 P.3d 1099 as the usual framework to determine whether "newly discovered evidence" warranted a new trial:

(1) The evidence must have been discovered since the defendant's trial;
(2) The failure to discover the evidence sooner must not be the result of a lack of diligence on the defendant's part;
(3) The evidence must be material to the issues at trial;
(4) The evidence must be neither cumulative nor merely impeaching; and
(5) The evidence must indicate that a new trial has a reasonable probability of resulting in a different outcome.

*Beach I*, ¶ 38 (quoting *Clark*, ¶ 34). However, recognizing that *Clark* was not a postconviction relief case where the petitioner was filing beyond the statutory time bar, we modified the fifth element of the test to "conform to the miscarriage of justice standard." *Beach I*, ¶ 48. To satisfy the modified fifth element, Beach was required to demonstrate his "actual innocence." *Beach I*, ¶¶ 42-43.

## I. SUBSTANTIVE INNOCENCE AND PROCEDURAL INNOCENCE

¶11 We have recognized two species of "actual innocence" claims—substantive and procedural. In *Pope* and *Beach I*, we discussed the substantive innocence framework from *Herrera v. Collins*, 506 U.S. 390, 113 S. Ct. 853 (1993), and the procedural

6

innocence framework from *Schlup v. Delo,* 513 U.S. 298, 115 S. Ct. 851 (1995). *Pope,* ¶¶ 40-49; *Beach I,* ¶¶ 29, 44.

### A. Substantive Actual Innocence—*Herrera* "Freestanding" Claim.

¶12 A *Herrera* substantive, or "freestanding," innocence claim alleges that newly discovered evidence demonstrates that the petitioner is "actually innocent" of the crime for which he was convicted in the true sense of this phrase—that the defendant truly did not commit the crime. *Herrera,* 506 U.S. at 417, 113 S. Ct. at 869. However, a duly convicted defendant remains guilty "in the eyes of the law" and carries presumed guilt, not innocence. *Herrera,* 506 U.S. at 399, 113 S. Ct. at 860. The presumption of guilt combined with the substantial interest in finality of convictions "necessarily" makes the threshold for *Herrera* freestanding claims of innocence "extraordinarily high." *Herrera,* 506 U.S. at 417, 113 S. Ct. at 869. Because the petitioner's evidentiary showing was particularly weak in *Herrera,* the Court denied relief without stating what burden must be met to satisfy this "extraordinarily high" threshold. *Herrera,* 506 U.S. at 417, 113 S. Ct. at 869.

¶13 In *Beach I,* we stated that this "extraordinarily high" standard of review applied to Beach's freestanding claim of actual innocence. *Beach I,* ¶ 44. Although *Herrera* had not done so, we set forth the evidentiary and legal standard as follows: "Beach must show by clear and convincing evidence that . . . no reasonable juror would have found him guilty of the offense in order for him to prevail on his substantive innocence claim."

7

*Beach I*, ¶ 44.[1]  We explained that, if Beach satisfied this standard, he would be exonerated from the conviction entirely.  *Beach I*, ¶ 45 ("A substantive innocence claim, if successful, results in the petitioner's release.").  Under a *Herrera* claim, the defendant is considered truly innocent and is forever exonerated.

**B.      Procedural Actual Innocence—*Schlup* "gateway" claim.**

¶14      The "actual innocence" necessary for purposes of a *Schlup* claim is different from the "actual innocence" necessary for purposes of a *Herrera* claim.  *Schlup*, 513 U.S. at 313-14, 115 S. Ct. at 860-61.  A *Schlup* procedural, or "gateway," innocence claim alleges that newly discovered evidence demonstrates that "a constitutional violation has probably resulted" in a wrongful conviction.  *Schlup*, 513 U.S. at 327, 115 S. Ct. at 867.  Unlike a *Herrera* "freestanding" claim, a *Schlup* claim is premised on an underlying allegation that constitutional error occurred during the trial process, resulting in a wrongful conviction.  While a *Schlup* claim accompanies an assertion of trial error, a *Herrera* claim assumes that the trial was error free.  *Schlup*, 513 U.S. at 315-16, 115 S. Ct. at 861.  A *Herrera* claim requires "evidence of innocence . . . strong enough to make [the criminal sanction] 'constitutionally intolerable' *even if* his conviction was the

---

[1]  The entire sentence read: "Beach must show by clear and convincing evidence that, *but for a procedural error*, no reasonable juror would have found him guilty of the offense in order for him to prevail on his substantive innocence claim." *Beach*, ¶ 44 (emphasis added).  The District Court correctly decided to ignore the "but for a procedural error" phrase in this sentence, noting properly that "a freestanding, or substantive, claim of actual innocence is founded on the notion of an error free trial," and thus there is no consideration given to any procedural errors under a *Herrera* claim.  *See Schlup*, 513 U.S. at 315-16, 115 S. Ct. at 861 (noting that a *Schlup* claim accompanies an assertion of error at trial, whereas a *Herrera* claim concedes that the trial was error-free); *accord Pope*, ¶ 48 ("The [*Herrera*] claim stands alone before the court and must be more convincing than a claim accompanied by other alleged infirmities.").

product of a fair trial." *Schlup*, 513 U.S. at 316, 115 S. Ct. at 861-62 (emphasis in original). There is no "gateway" in a *Herrera* claim, as success on the claim forever ends the matter. While a *Herrera* petitioner is required to affirmatively "present evidence that he did not commit the crime," a *Schlup* petitioner "*need not prove that he did not commit the crime*," but "only has to be successful in convincing the reviewing court that a reasonable jury would not likely convict him in light of the new evidence." *Pope*, ¶ 49 (emphasis added). In other words, a *Schlup* petitioner must only produce evidence that creates "sufficient doubt about his guilt to justify the conclusion that his [criminal sanction] would be a miscarriage of justice *unless* his conviction was the product of a fair trial." *Schlup*, 513 U.S. at 316, 115 S. Ct. at 861-62 (emphasis in original). If the *Schlup* petitioner makes this required showing, he passes through the "gateway" and is entitled to present to the court his constitutional claims of trial error, despite the procedural bars that would normally prohibit such claims. *House*, 547 U.S. at 555, 126 S. Ct. at 2087 (the petitioner "may proceed on remand with procedurally defaulted constitutional claims" because he satisfied *Schlup*'s actual innocence "gateway"). If the petitioner subsequently prevails on his constitutional claims, he is entitled to a new trial. *Carriger v. Stewart*, 123 F.3d 463, 482 (9th Cir. 1997) (en banc) (Carriger's success on his underlying constitutional claims "entitled him to a new trial").

¶15 In *Beach I*, we expressed agreement with the U.S. Supreme Court that "gateway" claims "warrant[ed] the application of a different standard of proof" than *Herrera* "freestanding" claims. *Beach I*, ¶ 45. We earlier adopted the multi-step "gateway"

9

procedure in *Pope*, requiring the petitioner to demonstrate his innocence in order to pass through the gateway *and then* prove his constitutional claims before obtaining a new trial. Pope pursued a *Schlup* gateway claim, alleging that a jury instruction violated his right to a unanimous verdict and prosecutorial misconduct denied him a fair trial. *Pope*, ¶ 37. To pursue these time-barred claims, Pope had to introduce the "necessary gateway evidence," which he did in the form of DNA evidence from the victim's vaginal swab and underwear that showed the semen present was not his. *Pope*, ¶¶ 30, 54. We concluded "it is *probable* no reasonable juror would have found beyond a reasonable doubt that Pope was guilty" of sexual intercourse without consent if presented with the new DNA evidence, but we did not immediately order a new trial. *Pope*, ¶ 63 (emphasis added). Rather, we then proceeded to Pope's constitutional claims and, upon the State's concession, ultimately held that the jury instruction that permitted conviction without a unanimous vote violated his constitutional rights. *Pope*, ¶ 68. Only then did we remand for a new trial. *Pope*, ¶ 70. We reaffirmed this procedure in *Beach I*, ¶¶ 34-35, where we explained that the State's concession in *Pope* that constitutional errors had occurred in Pope's original trial warranted a new trial.

¶16 In sum, *Herrera* freestanding claims and *Schlup* gateway claims both require that a petitioner demonstrate his "actual innocence." *Pope*, ¶ 48 ("Actual innocence is different in a *Herrera* petition and a *Schlup* petition."). A *Herrera* freestanding petitioner must show by "clear and convincing evidence" that "no reasonable *juror*" would find him guilty, whereas a *Schlup* gateway petitioner must merely show that it is "likely" or

10

"probable" that "no reasonable *jury*" would find him guilty.[2]  A *Herrera* freestanding claim has the higher threshold because, if met, the petitioner is forever exonerated.  A *Schlup* gateway claim has a lower threshold because, if met, the petitioner is merely permitted to avoid the application of procedural bars and present his claims of constitutional trial error.

## II.  THE DISTRICT COURT'S DECISION

¶17    The District Court failed to appreciate that both *Herrera* freestanding claims and *Schlup* gateway claims require a showing of "actual innocence."  Thus, the District Court's expressed intention to proceed "just" on Beach's "actual innocence" claim did not differentiate which kind of claim it was analyzing.  As noted above, the term "actual innocence" does not uniquely describe either a *Herrera* freestanding claim or a *Schlup* gateway claim—a petitioner must show his actual innocence for either claim.  The District Court's analytical error permitted it to pick any rule statement from *Beach I* pertaining to "actual innocence"—whether it was from the freestanding *Herrera* analysis or the gateway *Schlup* analysis—and apply it to Beach's claim.  It did so frequently and thereby conflated the standards.

---

[2]  It has been explained that, for a freestanding claim, the petitioner is successful only if the court believes that none of twelve potential jurors would find the petitioner guilty; whereas, for a gateway claim, the petitioner is successful if the court believes that any one of twelve potential jurors would find the defendant not guilty.  *Schlup*, 513 U.S. at 333, 115 S. Ct. at 870 (O'Connor, J., concurring).

11

¶18    Nevertheless, the District Court ultimately slid to the determination that Beach had succeeded only on his gateway claim, and had failed to meet the stricter requirements of a freestanding claim:

> After a review of the Court's analysis of the new evidence, it might reasonably be asked why the Court does not just release Mr. Beach. The testimony of Mr. Holen, that he saw not only Kim Nees in the pickup (with four other girls) that night but also a male in the right passenger seat, leads this Court to conclude that *the evidence is not sufficiently clear and convincing to bust down the absolute innocence gateway*[3] *and have Mr. Beach walk through it a free man.* Also, we have Mr. Beach's confession to consider. However, the totality of the evidence is clear and convincing enough to rule that Mr. Beach has certainly opened the actual innocence gateway sufficiently enough to walk through the miscarriage of justice exception toward a new trial.

> Given the *Pope* precedent, if Beach has passed through the actual innocence gateway [then] his constitutional claims are not barred.

(Emphasis added; brackets in original.)

¶19    The District Court thus held that Beach had proceeded through *Schlup*'s "actual innocence gateway." This would entitle Beach to present his time-barred constitutional claims. However, instead, the District Court held that Beach need not present his constitutional claims, but could go straight to a new trial, stating incorrectly that Beach's constitutional claims could then be taken up:

> Given the *Pope* precedent, if Beach has passed through the actual innocence gateway then his constitutional claims are not barred. In other words, Beach can proceed to a new trial where he can present not only the actual innocence evidence but also the constitutional innocence evidence.

---

[3]  Again, there is no "gateway" in a freestanding *Herrera* actual innocence claim.

(Internal quotation marks, brackets, and citations omitted). Of course, *Pope* does not permit leapfrogging from the gateway to a new trial and therein presenting "constitutional innocence evidence." In *Pope*, petitioner's constitutional claims of trial error were analyzed before relief could be granted. *Pope*, ¶¶ 68-69. After all, the entire point of passing through the "gateway" is to permit the time bar to be circumvented so that constitutional claims can be presented. Those claims are presented in a postconviction hearing, not within a new trial.

¶20 The District Court also failed to apply the unique evidentiary standard of review required in actual innocence cases. As discussed in detail below, a court must analyze not only the credibility and believability of the new proffered evidence, but must also compare that new evidence against the tested trial evidence. Comparing the evidence ensures that the court 1) makes an informed judgment as to what a reasonable juror would do given all of the evidence, old and new, and 2) does not overturn a valid verdict based upon unreliable evidence. In *Schlup*, the Supreme Court stated that a reviewing court "must make its determination concerning the petitioner's innocence 'in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial.'" *Schlup*, 513 U.S. at 328, 115 S. Ct. at 867 (quoting Henry J. Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments*, 38 U. Chi. L. Rev. 142, 160 (1970)). *Schlup*'s reference to "all" of the evidence, including that "illegally admitted" at trial, necessarily encompasses all of the

trial evidence. *See House*, 547 U.S. at 538, 126 S. Ct. at 2077 ("*Schlup* makes plain that the habeas court must consider all the evidence, old and new, incriminating and exculpatory . . . ."). We have followed this practice. *Redcrow*, ¶ 37 (rejecting innocence claim because the new evidence failed to "overcome" the evidence of Redcrow's guilt presented at her trial). However, the District Court failed to do so.

¶21 The District Court spent nearly half of its 30-page order summarizing and analyzing Beach's new evidence, but made only a passing general mention of one part of evidence presented at Beach's trial—his confession—and did not consider the specifics of Beach's confession. The court rebuffed the State's repeated requests that it analyze the new evidence in light of the old trial evidence, stating: "that is not what the *Schlup* Court held." The court explained that its refusal to expand its evidentiary inquiry into all of the evidence presented at Beach's trial was based on its reading of *Schlup* and *Redcrow*: "*Schlup* and its Montana progeny deal exclusively with and constantly reiterate the concept of **new evidence** and its role in approving or rejecting a petition for post-conviction relief." (Emphasis in District Court order.) Not only does this assertion contradict this Court's practice, *see Redcrow*, ¶ 37; *Pope*, ¶ 61, it is also illogical. The critical importance of reviewing all of the evidence is illustrated by an exaggerated example: if the State introduced, during trial, a videotape clearly depicting a defendant killing a victim, would hearsay testimony offered years later about others committing the crime support a claim of actual innocence? Of course not. But, under the District Court's reasoning, the trial videotape would not be considered in the inquiry. The

14

District Court erred by failing to appreciate that an actual innocence claim requires it to compare all of the evidence.

### III. THE EVIDENCE

#### A. Unique evidentiary standard of review for actual innocence claims.

¶22 Freestanding *Herrera* claims and *Schlup* gateway claims come to courts in a unique procedural posture. The petitioner has been previously convicted at trial—*i.e.*, the State has already introduced evidence sufficient for a jury to find the petitioner guilty beyond a reasonable doubt. "Thus, in the eyes of the law, petitioner does not come before the Court as one who is 'innocent,' but on the contrary, as one who has been convicted by due process of law of [a] brutal murder[]." *Herrera*, 506 U.S. at 399-400, 113 S. Ct. at 860; *accord Herrera*, 506 U.S. at 419, 113 S. Ct. at 870 (O'Connor & Kennedy, JJ., concurring) ("petitioner is not innocent in the eyes of the law because, in our system of justice, the trial is the paramount event for determining the guilt or innocence of the defendant") (internal quotation marks and citations omitted). To overcome the presumption of guilt that comes with conviction at trial, an actual innocence petitioner must show that new *reliable* evidence, when weighed against the *trial* evidence, demonstrates he is actually innocent of the crime he was convicted of. *Schlup*, 513 U.S. at 328, 115 S. Ct. at 867. This inquiry necessitates a unique two-step evidentiary standard of review.

¶23 Not just any kind of evidence can support an "actual innocence" claim. "To be credible, such a claim requires petitioner to support his allegations of constitutional error

with new *reliable* evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324, 115 S. Ct. at 865 (emphasis added).  In the context of new testimonial evidence, the court must first determine whether, based solely on the witness's testimony, it finds the witness credible and believable.  Then, the court must determine whether the proffered new testimony is credible and believable in light of the evidence presented at the petitioner's trial:  "Because *Schlup* also requires that any new evidence of actual innocence be reliable, the [reviewing] court must analyze not only whether the new evidence throws the pre-existing evidence into doubt, but whether the new evidence itself may be considered reliable in light of the pre-existing evidence." *Menefee*, 391 F.3d at 172  (Sotomayor, J.); *accord Schlup*, 513 U.S. at 327-28, 115 S. Ct. at 867; *Pope*, ¶ 62.

¶24    In *Anderson v. City of Bessemer*, 470 U.S. 564, 575, 105 S. Ct. 1504, 1512 (1985), the Supreme Court explained that testing new testimony for both internal inconsistencies and inconsistencies with the factual record ensures that a trial court cannot insulate its findings from review simply by labeling them "credibility determinations":

> This is not to suggest that the trial judge may insulate his findings from review by denominating them credibility determinations, for factors other than demeanor and inflection go into the decision whether to believe a witness.  Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it.

16

¶25 *Menefee* well illustrates the propriety of an appellate court reversing a trial court's finding of "actual innocence" when the new evidence is unreliable in light of the pre-existing trial evidence. In *Menefee*, the Second Circuit reversed the trial court's finding of actual innocence for the petitioner's gateway claim. *Menefee*, 391 F.3d at 150. The petitioner had been convicted of second-degree sodomy stemming from his alleged sexual intercourse with a 14-year-old boy. *Menefee*, 391 F.3d at 153. Years later, he petitioned for habeas relief alleging that newly discovered evidence established he was actually innocent—the child victim, then of age, had recanted. *Menefee*, 391 F.3d at 158. Similar to the District Court's assessment here of the testimony of then-child witness Stephanie Eagle Boy, the trial court there found that the testimony from the recanting victim was "credible in its entirety" and "forthright and responsive." *Menefee*, 391 F.3d at 158. The trial court believed the victim's recantation, and held that the petitioner had demonstrated his actual innocence. *Menefee*, 391 F.3d at 158. The Second Circuit, then-Judge Sotomayor writing, reversed and explained that whether a witness was believable was only "one element" in the unique standard of review for actual innocence claims; the court must also determine whether its subjective impression that the witness was credible "can be sustained in light of the record as a whole":

> Even where a court finds that a witness appears to be telling the truth, it must, as *Anderson* recognizes, evaluate the testimony in light of the substance of other evidence, considering the potential motives to be untruthful that the witness may possess, corroboration or lack thereof, internal consistency, and the inferences or assumptions that crediting particular testimony would require. *See Anderson*, 470 U.S. at 575, 105 S. Ct. 1504.

This is particularly true in the context of an actual innocence determination, as *Schlup* requires the habeas court to determine whether the new evidence on which the actual innocence claim is based is reliable. *See Schlup*, 513 U.S. at 324, 115 S. Ct. 851. In order to make this assessment where, as here, the new evidence consists entirely of testimony that challenges the facts on which the prosecution relied in obtaining the conviction, the court must carefully consider the nature of the testimony in light of the existing record to determine whether it can be considered reliable. *See id.* at 327-38, 115 S. Ct. 851; *Anderson*, 470 U.S. at 575, 105 S. Ct. 1504. The court's conclusion that it believed a witness's testimony at an evidentiary hearing is only one element of the determination that the testimony constitutes new reliable evidence. The court must then evaluate whether its subjective impression of the testimony can be sustained in light of the record as a whole.

*Menefee*, 391 F.3d at 165. The Second Circuit found the victim's recantation not credible because the record showed that two New York state prosecutors had interviewed the victim before the original charges were filed, and the victim told the prosecutors that the petitioner had had sexual intercourse with him. *Menefee*, 391 F.3d at 170. Years later at the innocence hearing, the victim testified that the prosecutors were fabricating his statements because he had denied any impropriety between himself and the petitioner during those interviews. *Menefee*, 391 F.3d at 170. The Second Circuit found that a juror would not likely credit the victim's "conspiracy" theory that the prosecutors were fabricating testimony:

In order to credit [the victim's] testimony over [the prosecutors' testimony] . . . the factfinder would have to conclude that [the prosecutors] were part of a conspiracy to fabricate their account of [the victim's] statements and the notes that recorded the statement. . . . it would have to discredit both prosecutors and find that a conspiracy existed in the DA's Office in 1994, in order to credit [the victim's] testimony.

18

*Menefee*, 391 F.3d at 171. Because of the improbability that a juror would credit the victim's conspiracy theory over the testimony of two prosecutors, the Second Circuit held that the victim's testimony was unreliable. *Menefee*, 391 F.3d at 171. Because the petitioner had not presented any new reliable evidence, it was unnecessary for the Second Circuit to proceed to the second step of the unique standard of review. *Menefee*, 391 F.3d at 172 ("Because Doe has not presented any new reliable evidence, it is unnecessary to determine whether no reasonable juror would convict in light of Doe's newly proffered evidence."). Only new evidence that is reliable requires further analysis of the claim.

¶26 The second step of the unique standard of review requires the court to combine the new reliable evidence with the old trial evidence and determine whether a reasonable jury that was presented with this hybrid record would find the petitioner guilty.[4] In other words, the court must "make a probabilistic determination about what reasonable, properly instructed jurors would do" if the new *reliable* evidence was admitted alongside the old trial evidence. *Schlup*, 513 U.S. at 329, 115 S. Ct. at 868; *House*, 547 U.S. at 538, 126 S. Ct. at 2078 ("Because a *Schlup* claim involves evidence the trial jury did not have before it, the inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record."). Because the determination as to "whether no reasonable juror would find a petitioner guilty beyond a reasonable doubt is

---

[4] This is the standard for a gateway claim. The standard for a freestanding claim would require the court to determine whether the petitioner has demonstrated by "clear and convincing evidence" that "no reasonable juror" would find him guilty, *Beach I*, ¶ 44, if presented with the hybrid record.

19

a mixed question of law and fact, we review the district court's ultimate finding of actual innocence *de novo*." *Menefee*, 391 F.3d at 163.

¶27 In *House*, the U.S. Supreme Court reversed the trial court's finding that the petitioner's new evidence was insufficient to show "actual innocence" under the gateway standard. *House*, 547 U.S. at 554, 126 S. Ct. at 2086. The Court rejected the notion that, absent a showing of clear error in crediting individual witnesses, the Court was required to defer to the trial court's ultimate conclusion as to whether a jury, presented with all of the evidence, would find the petitioner guilty:

> The State also argues that the District Court's findings in this case tie our hands, precluding a ruling in House's favor absent a showing of clear error as to the District Court's specific determinations. This view overstates the effect of the District Court's ruling. Deference is given to a trial court's assessment of evidence presented to it in the first instance. *Yet the Schlup inquiry, we repeat, requires a holistic judgment about all the evidence, and its likely effect on reasonable jurors applying the reasonable-doubt standard.* As a general rule, the inquiry does not turn on discrete findings regarding disputed points of fact, and it is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses.

*House*, 547 U.S. at 539-40, 126 S. Ct. at 2078 (emphasis added; internal citations, quotations marks, and brackets omitted). The Court reversed the trial court, and held that House's evidentiary showing was sufficient to demonstrate actual innocence for purposes of a gateway claim, but not for purposes of a freestanding claim:

> This is not a case of conclusive exoneration. Some aspects of the State's evidence—Lora Muncey's memory of a deep voice, House's bizarre evening walk, his lie to law enforcement, his appearance near the body, and the blood on his pants—still support an inference of guilt. Yet the central forensic proof connecting House to the crime—the blood and the semen—

20

has been called into question, and House has put forward substantial evidence pointing to a different suspect.

. . .

House has satisfied the gateway standard set forth in *Schlup* and may proceed on remand with procedurally defaulted constitutional claims.

*House*, 547 U.S. at 553-55, 126 S. Ct. at 2086-87.

¶28 Given this analysis of the proper evidentiary standards of review, we turn to the evidence presented at Beach's 1984 trial, and then to Beach's new evidence.

### B. Evidence Presented at Beach's 1984 Trial.

¶29 Beach's trial was held in Glasgow in April 1984. After five-and-a-half hours of deliberations, the jury returned a unanimous guilty verdict. The trial evidence is consolidated below into three substantive areas.[5]

### 1. The Confession[6]

¶30 During January 1983, Beach made numerous statements to multiple Louisiana police officers in which he confessed to killing Nees. During this time period, Beach had moved from Poplar to live with his father and stepmother in Monroe, Louisiana. On January 4, 1983, Beach's stepmother called police and turned Beach in for contributing to

---

[5] All of the evidence referenced in this section is taken from the six-volume trial record.

[6] Beach raises questions about the discrepancies between his confession and the actual murder scene. It bears worth mentioning, however, that Beach's confession only contradicts the scene of Nees's murder in one way: the description of Nees's clothing she was wearing when murdered. The other "discrepancies" are merely details that were not included in Beach's confession. Further, these discrepancies do not constitute "new evidence" under *Schlup* or *Clark*. Beach's trial attorney aggressively attacked these "discrepancies" and the validity of Beach's confession in a pre-trial suppression hearing and at the 1984 trial. The validity of the confession was upheld first by the judge and then by the jury.

21

the delinquency of minors. He was arrested and taken to the Ouachita Parish Sheriff's Office.

¶31 On January 5, 1983, Beach telephoned his stepmother from jail and threatened to kill her. Scared, his stepmother and father called the Sheriff's Office and told them Beach had been a suspect in a Montana homicide and might be connected to several unsolved Louisiana homicides. They told law enforcement they were concerned because Beach was "quite capable of committing a murder under certain situations."

¶32 On January 6, 1983, Sergeant Jay Via (Sergeant Via) and Deputy Sheriff Richard Medaries (Deputy Medaries) of the Sheriff's Office talked to Beach for an hour. Prior to their questioning, they informed Beach of his *Miranda* rights and Beach signed a statement that he understood his rights and was waiving them. Beach confirmed that he had threatened to kill his stepmother and that he was, indeed, a suspect in a Montana homicide. Beach explained that he could "fly[] off the handle" and that he dealt with frustration in a "physical way."

¶33 On January 7, 1983, Sergeant Via picked Beach up from jail at 12:24 p.m. to conduct an interview. Sergeant Via advised Beach of his *Miranda* rights in transit and again before questioning him. The interview began at 12:52 p.m., but was interrupted at 12:58 p.m. when another police officer entered the room. Beach was again advised of his rights.[7] During the initial questioning, Beach denied killing Nees. With Beach's

---

[7] Pursuant to the Louisiana Sheriff's office policy, Beach was advised of his rights every time someone entered the interview room. This policy ensured that each officer could independently

22

permission, Sergeant Via then performed a voice "stress evaluation test" on Beach. In the test, Beach's answers to a series of questions were recorded and measured for fluctuations that indicated stress in his responses. Stress could indicate deception. From the test, officers believed Beach was being deceptive. Throughout the day, Beach was permitted to use the restroom and have coffee, cigarettes, snacks, and soda pop. Shortly after 3:00 p.m., Sergeant Via requested Commander Calhoun to perform a second "stress evaluation test" to confirm his conclusion that Beach was being deceptive about the Nees murder. Commander Calhoun performed another round of questioning until 6:30 p.m., when he asked Sergeant Via to reenter the room. When Sergeant Via reentered, Beach had "tears in his eyes" and he told Sergeant Via "he was afraid to admit [] what he had done in Montana[.]" At 6:51 p.m., Beach confessed to killing Nees to Commander Calhoun and Sergeant Via. At 7:08 p.m., Beach gave a recorded confession, providing details of how he had met up with Nees that day, why he had killed her, how he had killed her, and how he disposed of the body and the evidence tying him to the crime scene. He appeared "relieved" after giving this 40-minute taped statement.[8]

testify that Beach received the *Miranda* warnings and voluntarily waived his rights. Overall, the "record indicates that [Beach] received ten *Miranda* warnings between January 4 and January 11." *Beach v. State*, 217 Mont. 132, 152, 705 P.2d 94, 106 (1985).

[8] A secretary at the Sheriff's Office transcribed Beach's January 7 confession. Sergeant Via compared the transcription to the recording and made clerical corrections to the transcription. An evidence technician at the Sheriff's Office subsequently erased the tape containing Beach's confession. Beach has never claimed that he did not actually give the confession. However, he has offered changing theories about how the Louisiana police wrongfully induced his confession. At the 1984 suppression hearing, Beach said that he confessed because Commander Calhoun told him there was enough evidence to see him "fry in the electric chair" for the Louisiana murders,

¶34 Beach's account included details of his activities and whereabouts the day of Nees's murder. From 1:00 p.m. until 4:30 p.m., Beach said he was partying at Sandy Beach along the Poplar River with Shannon O'Brien and Calib Gourneau. When the group tried to leave, Beach's vehicle "got stuck" in the sand, and he became "very angry." Beach damaged his car trying to rock it out of the sand, and he "blew up." Beach got out of the vehicle, started "kicking the vehicle," hitting the vehicle, and cussing and stomping around. Gourneau "tried to calm [Beach] down," but, Beach explained, this only made him "madder and madder." Beach then "got into an argument" with Gourneau and left to walk back to Poplar. He said he would "send somebody back to pick [Gourneau and O'Brien] up," but did not do so.

¶35 At trial, Shannon O'Brien corroborated Beach's account of what happened at Sandy Beach, with the addition of two details. First, after the car got stuck, Beach threw beer bottles at the car. Scared, O'Brien rolled up the windows and locked the doors and did not emerge from the car until Beach left. Second, the angry Beach told O'Brien and Gourneau that he "wanted to get a woman."

¶36 When Beach got home, he looked for beer in the refrigerator and started to make something to eat. He changed his mind, however, and went upstairs and fell asleep in his

and by confessing Beach would be permitted to return to Montana. In his 1995 petition for postconviction relief, Beach asserted that he confessed because he felt helpless after being held for four days after his arrest without seeing his family or a judge. However, in a 2002 interview, Beach stated that his "number one theory" of why he confessed was that Sergeant Via, Commander Calhoun, and Deputy Medaries had drugged his milkshake, rendering him susceptible to the officers' suggestions: "I know there was something in that milkshake. For my memory to go to where I just don't remember, something happened to me."

room. Beach awoke sometime "after dark." He left the house, and started walking toward town. When he got to the Exxon service station, a popular place for Poplar teenagers to meet, he found Nees sitting in her pickup. Beach was dating Nees's sister, Pam, at the time. Beach asked if he could ride around with Nees, and the two drove around Poplar until it was "fairly late at night." Eventually, they drove down to the Poplar River by the "train bridge," where Beach said he turned the conversation to "intimate" topics. He asked Nees about "making love to her boyfriend," and if she would have sex with him. She said no. This "upset him" a little, so he decided to try harder. He smoked "another joint with her" in hope that "she would get a little bit more messed up[.]" Finally, he "reached over to kiss her and she pushed [Beach] away." This made Beach "pretty mad," and he asked Nees why girls around Poplar did not like him. She said it was because he was an "asshole."

¶37 This upset Beach "quite a bit." He tried to grab Nees and she slapped him. He reached over, grabbed her by the arm, and pulled her over next to him. Nees fought back. Beach said this made him fly "off the handle again." He got so mad he "didn't really know what [he] was doing." He hit her with his fist. Then he picked a "twelve inch crescent wrench" off the floorboard and started hitting her with it. Nees retreated out the driver-side door of the pickup. Beach dropped the wrench as he rushed out the passenger-side door to catch her "before she run off." He "caught her as she was coming out the door." Beach again tried to kiss her, and Nees scratched him. This only made Beach madder; he threw her up against the truck and choked her. He reached into the

25

back of the pickup and grabbed a tire iron. He "started hitting her with that, telling her [he] was going to kill her, calling her a bitch, and cussing her." He hit her "anywhere and everywhere [he] could." Nees was "covering her head with her arms and screaming." Nees got away from Beach, and ran to the other side of the pickup, but Beach "tackled her" next to the "passenger rear tire" and "hit her a couple more times" on the head with the tire iron. When he realized that Nees had "quit moving," Beach stopped and stood up. He looked at Nees, took a few steps back, and then returned to her body to check for a pulse. He found none.

¶38 Beach explained that he then began to dispose of the evidence. He threw the crescent wrench and tire iron into the Poplar River. He then began to look for something to help drag the body over to the river. He found a plastic garbage bag and "tried to put the body in it." He was able to fit Nees's folded legs and torso into the bag, with the bag coming up to under her armpits. Beach held the corners of the bag and dragged the body by the shoulders to the edge of the bank of the river. He pushed the body and bag over the edge of the bank. Beach believed that the plastic bag came off the body when he pushed it over the bank. Beach returned to the pickup, took the pickup keys and Nees's jacket, returned to edge of the river bank, and threw them in the river. Beach then wiped down the inside and outside of the truck with his shirt sleeve to remove fingerprints.

¶39 Beach left the scene on foot and went home. On his way, Beach realized that he was covered in blood. He wiped off as much blood as he could from his body, used a lighter to burn his shirt and pants in a nearby railroad boxcar, and disposed of his shoes.

26

Beach returned home in his underwear and washed off the remaining blood with soap and water. He then went to bed.

¶40 At the conclusion of this confession, Sergeant Via again advised Beach of his *Miranda* rights and asked him whether everything Beach told them was the "honest and complete truth." Beach responded: "Yes, sir." When asked if he had been forced by anyone to give the statement or whether he was tricked or forced into giving the statement, he responded: "No, sir."

¶41 The next day, January 8, 1983, Sergeant Via went to the jail to talk to Beach about three unsolved Louisiana murders. Beach told Sergeant Via that he had retained a lawyer. Sergeant Via did not ask Beach any further questions. Paul Henry Kidd (Kidd), Beach's Louisiana attorney, subsequently contacted Sergeant Via to request a meeting on January 11, 1983. He wanted to discuss the unsolved Louisiana murders. When Sergeant Via and his commanding officer, Lieutenant Joe Cummings (Lieutenant Cummings), met with Kidd and Beach, Sergeant Via read Kidd and Beach the *Miranda* rights, and Beach and Kidd signed a waiver form. When questioned about the Louisiana murders, Beach denied any involvement, but mentioned "on two or three occasions during the course of the interview" that he had killed Nees. Beach's admissions were made at different times throughout the interview in the presence of Sergeant Via, Commander Calhoun, Lieutenant Cummings, and Kidd.

¶42 Shortly after the January 11 meeting, Kidd approached the Louisiana officers and told them that Beach now wanted to confess to the three unsolved Louisiana homicides.

27

Kidd relayed details of the murders that Beach had supposedly provided. The officers followed up on the information, but could not confirm any of it. On January 20, 1983, they confronted Kidd about the veracity of the information. Kidd acknowledged to the officers that he had convinced Beach to falsely confess to these murders as a strategy to utilize an insanity plea. Kidd had gone so far as to make up an alternative personality for Beach's murderous alter ego, named "Ray Woods." Law enforcement then dropped Beach as a suspect in the Louisiana homicides.

¶43 During Beach's 1984 trial, his attorney, Charles "Timer" Moses (Moses), vigorously attacked the reliability of Beach's confession on various fronts. Cross-examining Via, Moses questioned Via about whether Beach had been "psychologically unsound" when he confessed, about obtaining Beach's false confession to the Louisiana murders, and about why he had not recorded the entire January 7 interview. Moses questioned whether Via had fed details of Nees's murder to Beach that provided the substance of the confession, and why Beach had been interviewed for over six hours on January 7. Via answered these questions and denied any wrongdoing. Cross-examining Calhoun, Moses asked if he had played the "bad cop" while Via had played the "good cop." He asked whether Calhoun had threatened to see Beach "fry in the electric chair" if he did not confess. Calhoun denied both. With Deputy Medaries on the stand, Moses elicited testimony that other criminals—serial killers Ottis Toole and Henry Lucas—had confessed to two of the three unsolved Louisiana murders to which

28

Beach had also confessed, insinuating the officers were engaged in obtaining false confessions.[9]

¶44   The jury went into deliberations with the clear understanding that determining whether Beach's confession was truthful or was a product of police coercion was a critical issue.  The judge specifically charged the jury with determining whether Beach's confession was voluntary and truthful.  In their closing arguments, both lawyers argued to the jury that Beach's confession was the crux of the case.  The prosecutor, Marc Racicot (Racicot), argued:

> So then, this all boils down, essentially, to two essential questions, and depending on how you answer those two simple questions, everything else is dispensed with.  Those two questions concern[] the defendant and his confession and as the Judge instructed you, "If the confession is voluntarily made" and "if his confession is true," and there is simply nothing left to determine.

---

[9] Beach points out that Via, Calhoun, and Medaries obtained false confessions to the unsolved Louisiana murders from Toole and Lucas, thus making the same insinuation as Moses did at trial.  Beach does not mention, however, that neither Toole nor Lucas was ever charged with any of these murders because their confessions were found to be false upon further investigation by Louisiana police.  Further, it is likely that police tactics had nothing to do with these false confessions.  In the 1980s, Lucas confessed to "hundreds of unsolved murders in the USA," and has been dubbed "the most prolific serial confessor in world history."  Gisli H. Gudjonsson, *The Psychology of Interrogations and Confessions: A Handbook* 554 (Wiley & Sons, Inc. 2003) [hereinafter Gudjonsson].  While in Texas custody for 18 months, Lucas confessed to over 600 murders.  Gudjonsson, at 555.  When subsequent investigation proved Lucas to be lying, he explained that he falsely confessed to the murders, not because of overzealous interrogation tactics, but to "get revenge on the police for having arrested him on a made-up firearm charge[,]" to "impress the judge," and because being the "biggest monster alive" in the eyes of the media "made him feel good."  Gudjonsson, at 558.  Sergeant Via explained at Beach's clemency hearing that, during June 1983, he traveled to Montague, Texas where Lucas was being held by Texas authorities to interview him about the three unsolved Louisiana murders.  Via conducted two interviews and Lucas admitted to "killing three girls in the Monroe area."

Moses likewise focused on the confession, raising questions about the tactics used by the Louisiana police to get the confession and the truthfulness of police officers' testimony at trial:

> You recall Mr. Via talking about his interviews with Mr. Beach, let's see, on the 6th and 7th of January, and again on the 11th and also on the 20th, and he testified under oath . . . that there was . . . adequate belief in his opinion to go before the Court and secure a search warrant in connection with Mr. Beach's participation in the three murders in Louisiana. Now how does he explain that away? He says that it was a ploy by this Louisiana lawyer. Well now, in the first place lawyers may not be that smart, but they sure in hell are not dumb, to come in and make a statement like that would be absolutely absur[d]. A lawyer would have to be insane to do that, and you know that and Mr. Racicot knows that and Mr. Racicot knows that I know that. Now then, if Mr. Via is such a good investigator he should have had something about that in his notes and records and would be able to talk to us about it.

¶45    The jury obviously rejected Beach's conspiracy theory that all of the Louisiana police officers were lying when they testified that Beach voluntarily confessed to Nees's murder on several occasions.

### 2. The Crime Scene—the train bridge and nearby witnesses

¶46    At trial, the State called former Tribal Police Officer Alfred Lizotte (Lizotte) to testify about the scene of the crime. Lizotte was on patrol in Poplar with Sergeant Calvin Red Thunder (Red Thunder) the morning of Nees's murder, and saw a pickup parked by the Poplar Train Bridge at about 4:15 a.m. When the pickup had not moved by 7:00 a.m., the officers decided to investigate. Approaching the pickup, they saw blood and hair on the inside, as well as outside on the passenger side.

30

¶47 Next to both the driver's side and the passenger's side of the pickup there were "scuffle marks" where the dirt was "kicked up in places." Ten feet from the passenger side of the pickup was a "blood spot." Red Thunder observed "drag marks" leading away from the scuffle marks, and the officers followed these marks to the edge of the bank of the river. From there, the officers saw Nees's body, floating face-up in two feet of water about ten feet from the lower river bank. They immediately notified the County Sheriff, the Federal Bureau of Investigation, the Bureau of Indian Affairs, and the Fort Peck Tribal Police, and soon, representatives from all of these agencies responded to the crime scene.

¶48 Deputy Errol "Red" Wilson (Wilson) of the Roosevelt County Sheriff's Office testified about the evidence in and on the pickup. The inside of the pickup was consistent with Beach's explanation that he attacked Nees inside the pickup with a crescent wrench:

> **Q:** Did you notice any sign of scuffle or any blood in or around the vehicle?
>
> **A:** Yes sir.
>
> **Q:** And what did you notice?
>
> **A:** There was blood on the driver's door and the window; there was blood on the seat; there was hair and [] blood on the steering wheel; blood splattered on the ceiling; beer or urine on the driver's side of the seat, I smelled it but I couldn't tell what it was; there was bloody smudgy fingerprints on the upper right mo[l]ding.
>
> . . .
>
> **Q:** Inside?

**A:** Yes sir. There was blood spots on the back of the seat, there was blood splatters on the rear window, heavy blood splatters on the driver's side of the rear window; there were no keys in the vehicle; the gear shift lever was in park; the radio was on; the CB radio was off; the ash tray was open; on the ceiling there were three gouge marks with hair hanging out of them; there were gouge marks on the steering wheel; the heater was left on and the passenger door was locked.

Deputy Wilson also testified that the drag trail leading away from the vehicle had much less blood than at the edge of the bank where Nees's body was pushed over. These details were consistent with Beach's explanation that he had stuffed most of the body into a bag for dragging to the edge of the bank.

¶49 Wilson and other officers canvassed homes that were near the crime scene to determine whether anyone had seen or heard anything. Beach's residence was one of the houses close enough to warrant a visit, and Wilson stopped at the house. Wilson spoke with Roberta Clincher, Beach's mother. At trial, following a break in his testimony, Wilson re-took the stand and testified as follows:

**Q.** [Racicot]: [] I think previous to the time we terminated your questioning, I asked you if you had talked to Roberta Clincher at her home on the morning of June 16, 1979?

**A.** [Wilson]: Yes.

**Q.** [Racicot]: And that you was questioning her and a number—you and other officers were questioning her and a number of other people as to whether or not they seen or heard anything in relation to the death of Kimberly Ann Nees?

**A.** [Wilson]: Yes.

**Q.** [Racicot]: Did Mrs. Clincher make a statement to you concerning her son having come home early in the morning on that particular day?

32

**A.** [Wilson]:  Yes sir.

**Q.** [Racicot]:  And did she relate to you a statement concerning whether or not the defendant had blood upon his person when he came home?

**A.** [Wilson]:  Yes.

**Q.** [Racicot]:  And what was that statement?

**A.** [Wilson]:   She told me that the defendant had told her that he had wrecked the car, had gotten it stuck in the sand at the swimming hole and that they had been drinking and couldn't get the car out and he told her that he hit the car with his fist and that was to explain how he was covered in blood.

**Q.** [Racicot]:  She did tell you that he was covered in blood?

**A.** [Wilson]:  Yes.

¶50    Notably, it was Moses who called Joel Sparvier (Sparvier) as a witness.  Sparvier lived close to the Train Bridge, in the same house as his younger relative, then-10 year old Stephanie Eagle Boy, who did not testify at the trial.  Moses thought Sparvier may have heard something suspicious on the night of the murder.  However, Sparvier testified the only thing he heard that night was barking dogs:

**Q.** [Moses]: I direct your attention to the 16th day of June, 1979.  Did you hear any screams for help?

**A.** [Sparvier]: No. I didn't.  What I heard was dogs barking and these dog [sic] barking drowns out everything else.

**Q.** [Moses]: You didn't hear any screams coming from the area of the river bridge?

**A.** [Sparvier]: No.

### 3. The Forensic Investigation

¶51　The areas of concentration of the wounds inflicted upon Nees were her head, neck, and hands. The wounds themselves were consistent with being inflicted with two different weapons, consistent with Beach's confession that he had used a crescent wrench and a tire iron. Dr. John Pfaff testified to the following details of his investigation.

¶52　On June 16, 1979, Nees's body was retrieved from the Poplar River and transported to Great Falls for an autopsy. Dr. Pfaff, an experienced physician and forensic pathologist,[10] performed the autopsy and the subsequent forensic investigation. He took photographs of all of Nees's injuries, and opined that she had been killed by blows to the head:

> During the physical examination of the body, it was apparent that there were multiple injuries on her body, mainly about the head, the neck, shoulder areas and also involving the arms and hands. The most serious ones were ones involving the head and were those that caused her death.

The autopsy pictures confirmed that all of the major injuries sustained by Nees were to her neck and head area, and to her hands. There were no major injuries to her legs or the trunk of her body. These findings were consistent with Beach's confession that he had hit Nees in the head area with the tools, and were also consistent with his version that he was the sole attacker.

¶53　No possible weapons were initially provided to Pfaff and he did not initially make any conclusions as to the murder weapon, but concluded that "blunt force" had caused

---

[10] Dr. Pfaff had performed over 3,000 autopsies.

the injuries. After further investigation had identified possible weapons, police asked Pfaff to determine if a crescent wrench and a 20½ inch-long metal bar could have served as the murder weapons. Pfaff excluded the metal bar as the murder weapon, but opined that *some* of Nees's wounds could have been inflicted by the wrench. Later, after receiving Beach's confession, police asked Pfaff to consider whether Nees's wounds were consistent with blows from a tire iron. Pfaff concluded that the tire iron could have inflicted the injuries not caused by the wrench: "Neither [weapon] inflicted all of them, but together they could have inflicted all of them." Pfaff further concluded that Nees was already dead when she was put into the river, and that she had not recently had sexual intercourse. All of these findings were consistent with Beach's confession.

¶54 Moses called Roosevelt County Sheriff Dean Mahlum (Mahlum) to establish the lack of physical evidence tying Beach to the murder. While a bloody palm print and numerous fingerprints had been taken from the crime scene, and numerous blood samples had been taken from inside and outside the vehicle and from Nees's clothing, none of the prints or blood matched Beach. Mahlum testified that the lack of physical evidence against Beach was not suspicious, opining that sloppy crime scene investigation was the likely cause. From the beginning, there had been a breakdown in leadership in the investigation. Because the murder took place on an Indian reservation, federal, state, and tribal agencies were all involved, with no agency clearly in charge. Consequently, evidence was collected and stored in a haphazard manner, resulting in the contamination of scientific evidence. It was not peculiar that Beach's blood was not present at the

scene, Mahlum explained, because *all* of the blood located at the scene belonged to Nees. He also explained that the Train Bridge area was a popular hangout, which explained why the crime scene was riddled with "beer cans," "scraps of paper," and general "junk all over the place." Mahlum also testified that rumors regarding the murder were "rampant" and authorities checked out as many leads as possible. However, Beach's confession was different from these rumors because his story checked out.[11]

### C. Beach's New Evidence

¶55 In the early 2000s, Centurion Ministries began interviewing people who claimed to know about the murder. In 2007, the Clemency Panel held a three-day hearing on Beach's clemency petition. Also, in 2007, Dateline NBC interviewed several people claiming to have new information that pointed to a "pack of girls"—Sissy Atkinson, Maude Grayhawk, and JoAnn Todd—as Nees's true killers. In 2008, Dateline ran an episode on the murder. On August 1-3, 2011, the District Court heard testimony regarding Beach's claimed new evidence of innocence. All of this evidence was oral testimony.

¶56 Judy Grayhawk is the sister-in-law of Maude Grayhawk, one of the group identified as the "pack of girls." She testified that sometime in 2004 she received a phone call from Maude. Maude sounded depressed and admitted to kicking Nees in the

---

[11] Beach argues that the absence of his prints furthers his actual innocence claim, which is premised upon his theory that Nees was killed by a "pack of girls" who later made statements to others implicating themselves. However, as the State notes, all three of the girls asserted to be Nees's assailants submitted finger and palm prints to the FBI, which reported that none of the girls' prints could be matched to those found at the murder scene.

head and luring her down to the river. Maude sounded scared and believed she was going to prison. Judy says that Maude called her because Maude wanted Judy's son's help in "running away from an investigator."

¶57    Ron Kemp was the Criminal Investigator for the Roosevelt County Attorney's Office from 2003 to 2006. In early 2004, Centurion Ministries contacted the County Attorney's office, claiming to have discovered an eyewitness to the Nees murder. That eyewitness, Calvin Lester, said that on the night of Nees's murder, when he was ten years old, he had gone down to the railroad tracks and witnessed girls kicking someone on the ground. Lester told Kemp that Maude Grayhawk was one of the attackers. Kemp followed up by visiting Maude at her house, and she agreed to meet with Kemp at the Poplar Police Department the next day. Maude appeared as promised the next day, and denied any involvement in killing Nees. She told Kemp that she and four other girls had partied down by the Train Bridge from 9:30 p.m. until 10:00 p.m. the night Nees was murdered. Without more, Kemp found this unhelpful, because the time was at least three hours before the time of Nees's death. Kemp "pushed" Maude about her story, telling her "several times" that he had an eyewitness that implicated her in the murder. Nonetheless, she continued to deny any involvement, and eventually became "upset." Calvin Lester later recanted his story and admitted that he had lied about witnessing the murder and Maude's involvement.

¶58    Janice Johnson lives in Poplar and previously worked with Maude Grayhawk at a medical clinic. Sometime between 2005 and 2007, a Centurion Ministries investigator

came to talk to Maude. Maude directed Johnson to say she was not in. After the investigator left, Maude told Johnson that she did not want to talk to the investigator because he was investigating the Nees murder and, "My car was down there that night. Those girls had my car."

¶59 Richard Holen was 19 at the time of the murder and had been out drinking that night. He left a bar around 2:15 a.m. or 2:30 a.m., driving his vehicle out of Poplar to the west. On the road about one hundred feet ahead of him was Nees's pickup. Holen saw five people in the cab of the truck. The truck turned off the road and headed toward the Train Bridge. Holen continued along the road. Still later that night, Holen drove back by the Train Bridge area, and stated that he saw Nees's truck parked there with another vehicle. They were parked facing opposite directions so that the drivers could talk while remaining in their vehicles. Holen provided Centurion Ministries a statement in 2002 as to what he saw. Holen's statement did not include a substantial amount of information that he later testified to in 2011. In his 2002 statement, Holen mentioned seeing only Nees's truck parked at the Train Bridge at the later hour. When asked to explain this discrepancy between his 2011 and his 2002 statements, Holen said that over time "a little something else comes back" and that he had only recently remembered the additional details. Holen's 2002 statement was also silent as to the gender of the five occupants in Nees's truck. A few years later, during his Dateline interview, Holen was sure all five were females. Likewise, he testified to the Clemency Panel that all of the occupants were females. At the postconviction hearing in 2011, he changed his story, stating that they all

38

looked like girls except for a guy "sitting by the [passenger] door." Holen's only explanation for this new revelation was that his testimony had not changed "much."

¶60    Carl Four Star lives in Wolf Point and worked with Sissy Atkinson, another member of the "pack of girls," at A&S Industries (A&S) in 1985. A&S was an industrial manufacturer of camouflage netting for the U.S. military. Four Star testified that in 1985 he overheard Sissy talking to a co-worker at A&S about the Nees murder. Four Star was standing approximately 20 to 25 feet away at the time. Four Star says that the co-worker was reading a newspaper that reported Beach had been convicted of murder.[12] Four Star testified that the co-worker said something to the effect that it was a shame what happened to Beach. Sissy responded: "They got the wrong man. I was there." Then Sissy made motions like she was kicking someone on the ground. Later, Sissy walked past Four Star and told him that she had gotten away with the "perfect crime, a capital crime." Four Star came forward with this information for the first time some 15 years later when Centurion Ministries visited his mother's house looking for someone else. Four Star's original statement did not include any mention of Sissy making "kicking motions." During the postconviction hearing, the parties disputed whether Four Star could have overheard this conversation given the noise level in the factory. Four Star's testimony in this regard has changed over time. Four Star told the Clemency Panel that it was so quiet in the work area when Sissy made her comments that one could hear a "pin

---

[12] Beach was convicted in 1984.

drop." However, in 2011, Four Star testified that there was a radio playing "[l]oud enough that people could hear it" but not so loud "that it muted everyone out."

¶61 The State called Richard McDonald to rebut Four Star's testimony as to the noise level in A&S. Richard McDonald is a retired police officer of the Fort Peck Tribe who worked at A&S in 1983 and again in 1989. He testified that the area where Four Star worked was particularly noisy because of the large ventilation fans that were constantly running to clear out the "terrible smell" that came off the nets being made. He said that when people wanted to talk to each other they had to shout.

¶62 Stephanie Eagle Boy grew up in Poplar, and was ten years old at the time of Nees's death. She lived with Joel Sparvier close to the Train Bridge. Her favorite hang-out was "the rock," a place she could sit and overlook the Train Bridge. One night in 1979, Eagle Boy watched two vehicles approach the Train Bridge. At the beginning of her testimony at the 2011 hearing, Eagle Boy could positively identify only one of the vehicles as a truck, but midway through her testimony she was sure that both vehicles were "pickups." Eagle Boy said that the two pickups pulled in together and parked facing the same direction. Then girls got out of the vehicles and there was "horrific screaming" for 10 to 20 minutes. She heard girls yell, "Get her!" and "Kick the bitch!" She also heard another girl say, "Please, don't!" Then it got quiet, and a police car showed up with its lights already on. When it reached the pickups, it shut all of its lights off, and Eagle Boy heard "a little whispering or something." Then one of the pickups drove over to some tall grass and two people got out. She heard "digging" and "like a

40

clinking noise, like they dropped something like tools clinking together when you drop them." Then both of the pickups and the police car drove away from the area. Eagle Boy said her cousin, Joel Sparvier, was also outside watching and listening to this with her. Eagle Boy was surprised to learn that Joel Sparvier had testified at Beach's 1984 trial, and that he had only heard barking dogs that night, and no screaming.

¶63    Eagle Boy could not identify what night in 1979 her memory was of:

**Q:** While you were sitting out there . . . First of all let me ask you do you remember what day it was or what date it was?

**A:** No I don't.

**Q:** But you know it was summer?

**A:** Yeah.

**Q:** And, it was the year that your grandfather died?

**A:** Yes.

Eagle Boy's failure to know if her memories correspond to the night of Nees's murder was confirmed during the State's cross-examination:

**Q:** And, isn't it true that earlier, about a half hour ago the only way you knew it was the summer of 1979 was because it was hot is that correct?

**A:** Yes.

**Q:** Okay.  But, you don't know the date; you don't know exactly when it could have occurred except for the summer of 1979, correct?

**A:** Well, I can't remember.

**Q:** That's fine.  I am just asking.  Just confirming that.  All you know is it was the summer of 1979, correct?

41

**A:** Yes.

¶64 Billie Smith and Susan Mohler live in Missoula, and formerly worked with JoAnn Todd, formerly JoAnn Jackson, the final member of the "pack of girls," at an assisted-living facility there. During a cigarette break one day, Smith alleges that JoAnn Todd told her that when she was a teenager "she and a group of girls took another girl by the water and they dragged the girl out of the truck. She was not—she had nothing to do with this, but she was present when it happened." The girl was then killed. Smith asked Todd to repeat the story for another employee, Susan Mohler. While Mohler generally corroborated the story, she stated that Todd never said that she was at the killing, and that Todd insisted "she was not involved." Smith and Mohler came forward after watching Dateline.

¶65 Kevin Hall lives in Great Falls and was acquainted with Sissy Atkinson in 2004, during a time he said they both were doing a "fair amount" of pain killers. Hall said he did not like when Sissy would come around because she would get high and "sit and cry about karma all the time to [him]." Sissy told Hall that her former husband had died because of "bad karma" stemming from Sissy's involvement in beating a girl when she was a teenager. Hall testified that Sissy was high every time she brought up the beating, and that she told the story somewhere between five and twenty times. Hall testified that Sissy's story became more detailed with each telling. The first time Sissy brought it up, she merely said that a group of girls had beaten up another girl. But, by the final telling,

Sissy had told him that "they" had "lured" the victim down to the river, where they beat her with a "tire tool," and "rolled" her into the river while the girl was unconscious. Hall came forward after watching Dateline and, in 2010, provided Centurion Ministries with a written statement of what Sissy had told him. In the 2010 statement, Hall said that Sissy had told the story many times but had not given any more details than those in the first telling. In other words, Sissy's story never changed: "Sissy brought [the beating] up more than on one occasion, but never provided more detail." The District Court asked Hall to explain the inconsistency between his 2011 testimony and his 2010 statement regarding the details provided by Sissy. Hall offered that he had been off his "meds" for two days in anticipation of providing his testimony. He explained that his medications kept his ammonia levels down, and that high levels of ammonia put him in a "foggy, hazy state" and caused him to have "poor memory."

¶66 Michael John McIntire lived next door to Sissy Atkinson in Great Falls from 2004 through 2005. McIntire said that Sissy's apartment was abuzz with suspicious activity "24/7." After a man showed up threatening to shoot Sissy, McIntire confronted her and told her that he did not appreciate her activities putting his family in danger. McIntire said that Sissy looked him "straight in the face" and told him that he did not know who he was messing with, that she had killed some girl up on the reservation, and that she would kill him too. After McIntire saw an article in the Great Falls Tribune about Beach, he contacted the Tribune, who put him in contact with Centurion Ministries.

43

¶67 Former Sheriff Mahlum is now retired and lives in Wolf Point. Mahlum testified in the 1984 trial and at the 2011 postconviction hearing. Mahlum testified that Beach's confession contained details only Nees's killer would know. Nees's wounds were confined primarily to "the skull, the head region and also to the hands, backs of the hands[,]" and this information had not been divulged to the public. Nees's wounds matched Beach's version of the murder as stated in his confession. Further, Mahlum testified that it had not been divulged to the public that Nees had been attacked with at least two different weapons, and Beach had confessed to hitting Nees with a tire iron and a crescent wrench. Mahlum opined from his experience that concentrated injuries such as Nees's indicated "one perpetrator as opposed to a large group of people."[13]

---

[13] The court initially granted Beach's objection to this testimony "but only for purposes of setting a bit more foundation because we went from a few facts to conclusion and not enough sort of laying foundation about why that conclusion was reasonable." Thereafter, Mahlum laid the necessary foundation from his experience.

### D. Analysis of the Old and New Evidence.

¶68    Before overturning Beach's conviction, the District Court was to determine the reliability of Beach's new evidence. *Schlup*, 513 U.S. at 324, 115 S. Ct. at 865. In doing so, the court was to scrutinize the testimony for internal inconsistencies and inconsistencies with the "pre-existing record." *Menefee*, 391 F.3d at 172; *Pope*, ¶ 62; *Redcrow*, ¶ 37. Finally, if the court found Beach's new evidence reliable, the court was to combine that reliable evidence with the trial evidence and determine if a reasonable jury would find Beach guilty given the hybrid record. The District Court's conclusion that each of Beach's new witnesses provided "credible" evidence of his actual innocence is undermined by the court's failure to probe their testimony for internal inconsistencies with their previous statements and to determine whether "the testimony [could] be sustained in light of the record as a whole." *Menefee*, 391 F.3d at 165. Indeed, *Menefee* characterized the similar approach employed by the trial court in that case as "deeply flawed." *Menefee*, 391 F.3d at 165.

¶69    The most troubling of the District Court's findings was that Stephanie Eagle Boy's testimony alone had "surmounted" the clear and convincing evidence standard necessary to establish actual innocence. This finding illustrates the District Court's improper analysis because nothing Eagle Boy said proves anything about Nees's murder. While the District Court gratuitously attributed Eagle Boy's memories to the night Nees was murdered, she twice testified that she could not correlate the screams she heard to the specific night in question. She could only state it occurred sometime during the summer

45

of 1979. Eagle Boy's inability to correlate her memory to the relevant night significantly undermined the value of her testimony, as the Train Bridge area was frequently used for parties and as a hangout. Further, Eagle Boy testified that whatever night she had heard the screams, Joel Sparvier was outside with her and heard the same thing. However, unbeknownst to Eagle Boy, Sparvier had testified at Beach's 1984 trial. Unlike Eagle Boy, Sparvier remembered the specific night Nees was murdered, and stated that the only thing he heard on that night was barking dogs. It is unreasonable to conclude that a reasonable juror would likely credit Eagle Boy's vague testimony over Sparvier's specific memory of the night in question. This is particularly true given the timing of the submission of the conflicting accounts. While Sparvier testified five years after Nees's murder, Eagle Boy gave her account 32 years later. Eagle Boy supposedly watched and heard the girls attack another girl, and could even hear "whispers" from her position. However, the things she saw and heard were inconsistent with the murder scene. After hearing "horrific screaming" for 10 to 20 minutes and further yelling, Eagle Boy saw one of the pickups move near tall grass, followed by "digging" and "clinking" sounds. Then, she said the two pickups and a police car left the scene. However, to the contrary, Nees's truck did not leave; it was found at the scene. Although stating she could hear whispering, Eagle Boy did not recount hearing the sounds of a body being dragged 250 feet to the edge of the bank or splashing into the water after being thrown into the river. While the District Court may have found Eagle Boy's testimony to be compelling, when

viewed in comparison to the known crime scene evidence introduced at trial, and the limitations upon her recollection, it is not a reliable account of Nees's murder.

¶70 Unlike memories that normally fade over time, the memories of Beach's new witnesses have miraculously sharpened in detail over the years. In 2002, Richard Holen did not know the gender of the five occupants he saw in Nees's vehicle. In 2007, he told Dateline and the Clemency Panel that he remembered they were all females. In 2011, a startling new detail emerged—he now remembers that there were four females and one male in the pickup, and the male was sitting in passenger seat next to the door. It is unreasonable to conclude that a reasonable juror would substantially credit Holen's frequently changing testimony.

¶71 The same is true about Kevin Hall's testimony that Sissy Atkinson would get high on pain killers with him and recount beating a girl. In 2010, Hall stated that Sissy told him that she and a group of girls beat up a girl. She repeated this story to him somewhere between five and twenty times without providing "more detail." However, in 2011, Hall's story changed and he testified that Sissy instead provided more details with each subsequent telling of the story. This culminated in a final telling in which Sissy said they had "lured" the victim to the river, beat her with a "tire tool," and rolled her into the river. When questioned by the District Court about this substantial change in memory, Hall had no explanation other than he had gone off his "meds" in anticipation of his testimony. Further, the version of "rolling" the "unconscious" victim into the river conflicts with the physical evidence. The victim was not "rolled," but dragged, and the victim was already

47

dead when she was thrown into the river. Hall's testimony does not reliably counter the trial evidence, and it is unreasonable to conclude that a reasonable juror would likely credit the testimony.

¶72 Carl Four Star came forward for the first time over 15 years after hearing Sissy Atkinson's comments. His original version did not make mention of Sissy making "kicking motions." He originally said he could hear a pin drop in A&S Industries so he could overhear Sissy's statement from 20 to 25 feet away. At the hearing, he testified that a radio was playing loud enough for people to hear it but not so loud that "it muted everything out."

¶73 Calvin Lester recanted his story of seeing girls kicking a girl victim on the ground at the Train Bridge and seeing Maude Grayhawk among the attackers, but before he did so, Investigator Kemp contacted Maude, who agreed to meet Kemp at the Poplar Police Department. During his interview, Kemp pressed Maude to the point of tears, telling her there was an eyewitness who saw her kicking the victim at the scene. Nonetheless, Maude did not change her story that she was not involved in the crime.

¶74 Billie Smith and Susan Mohler recall a conversation with JoAnn Todd on a cigarette break about a killing, but Mohler recalls Todd stating that she (Todd) was not involved with the killing.

¶75 Finally, as former Sheriff Mahlum highlighted, and as mentioned above, Beach's new theory is inconsistent with the objective evidence of Nees's injuries and the crime scene. Beach offered witnesses who heard statements that a group of girls attacked and

48

kicked Nees.  These witnesses include Judy Grayhawk, Carl Four Star, Susan Mohler, Billie Smith, and Michael John McIntire.  The story arising from these statements offers no consistent theme about a weapon; rather, the primary attack was by beating and kicking.  However, the jury heard Dr. Pfaff's forensic testimony supported by numerous photographs showing that *all* of Nees's major injuries were to her head, neck, and hands.  There were no significant injuries to Nees's legs or torso.  This evidence pointed to a single attacker—consistent with Beach's confession and inconsistent with the new theory.  Nees's injuries were caused by two weapons, consistent with the crescent wrench and tire iron that Beach identified—again consistent with his confession and inconsistent with the new testimony.  Signs of a scuffle inside of Nees's pickup—gouge marks on the ceiling and on the steering wheel with hair attached, heavy blood spatters on the driver's side of the rear window, hair and blood on the seat and steering wheel, beer or urine on the driver's seat—were consistent with Beach's account of commencing the attack upon Nees with a wrench while she was sitting in the driver's seat, and have no known connection with the new theory.  Blood was pooled near the passenger side rear tire, and less blood was found along a drag trail leading away from the truck—consistent with Beach's explanation of his final assault upon Nees and her lifeless body lying at that location until he put the body in a plastic bag and dragged it to the river bank.  This evidence has no known connection to the new theory.  Deputy Wilson testified at trial that Beach's mother said Beach had returned home in the early morning hours "covered with blood."  Beach's confession indicated that he was covered with blood after the

49

assault. Even small details, such as the keys missing from Nees's truck, are consistent with Beach's confession that he threw the keys in the river, and have no known connection to the new theory. In view of the contradictions between the new testimony and the objective evidence tested at trial, we must conclude that the new testimony does not provide a reliable account of Nees's death that displaces the trial evidence upon which Beach was convicted.

¶76 The District Court found Beach's new "testamentary evidence as uniquely objective" as DNA evidence in other cases that proved actual innocence. Based upon our assessment of the evidence, we cannot agree. The Supreme Court has described the kind of evidence necessary to establish actual innocence and overturn a conviction as "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324, 115 S. Ct. at 865. Beach's new evidence—the statements offered by the witnesses in the postconviction hearing—did not provide this kind of reliable evidence.

¶77 As he did in the 1984 trial, Beach offers a conspiracy theory involving the four Louisiana police officers (Sergeant Via, Commander Calhoun, Deputy Medaries, and Lieutenant Cummings) who testified that Beach confessed multiple times to killing Nees. Several of these statements by Beach were made with his Louisiana lawyer present. All of the Louisiana officers denied that any trickery or threats were used against Beach. While Beach offers allegations to the contrary, there is no *evidence* that the officers used improper tactics. Sheriff Mahlum denied giving the Louisiana police officers details of

the murder scene. Yet, Beach provided a confession eerily consistent with the details of the crime scene and with Nees's wounds, including details that were not divulged to the public. Beach's conspiracy theory is nothing new; it was aggressively pursued by Moses during Beach's 1984 trial. The jury rejected it then, and we do not believe the jury was unreasonable in doing so.

¶78 Beach's new evidence—in the form of testimony that is primarily hearsay, internally inconsistent, and inconsistent with evidence presented at Beach's 1984 trial—does not reliably displace the evidence tested at Beach's trial, including his confession. Having concluded that Beach failed to satisfy the first step of providing reliable evidence, we need not proceed to the second step of the analysis. *See Menefee*, 391 F.3d at 163 (Because the defendant had not presented any new reliable evidence, it was unnecessary to consider the matter further). However, even if Beach's new evidence was deemed to be reliable, we conclude that his new evidence is <u>not</u> sufficient to demonstrate that "a reasonable jury would not likely convict him in light of the new evidence." *Pope*, ¶ 49; *accord Beach I*, ¶ 45. Instead, after reviewing the entirety of the combined, hybrid evidentiary record of the case, we conclude a jury would still be likely to convict Beach of the crime. Beach's failure to present the requisite reliable evidence is fatal to both his *Herrera* and *Schlup* actual innocence claims. He has thus failed to satisfy the modified fifth element of the *Clark* test. *Beach I*, ¶¶ 42-43.

## IV. CONCLUSION

¶79 The District Court made the mistake, deliberately, of listening to the new evidence, and failing to closely consider the old evidence. Thus, no matter how compelling the District Court found the new evidence to be, it committed error as a matter of law by refusing to consider that evidence *together with* the evidence presented during the 1984 trial to determine whether its impression of the testimony could be sustained in light of the record as a whole. After a review of *all* the evidence, we conclude that Beach did not provide reliable evidence of his actual innocence that displaced the trial evidence and thus his conviction. Our conclusion is consistent with the determination made by the unanimous three-member Clemency Panel, which performed an exhaustive inquiry into the case, that Beach's allegations are initially troubling on their face, but lack substance when closely scrutinized. Their comments provide a fitting summary of this matter:

> All three of us began our study by reading the complete files submitted by Centurion Ministries. All three of us, initially taking the contents at face value, were alarmed that Montana may have an innocent man imprisoned wrongly for all these years. It was from that posture and perspective that we proceeded to undertake our efforts in this matter. However, upon what then followed, an exhaustive inquiry and study, before, during, and after the hearing, the facts simply did not unfurl as they were alleged and characterized in the Centurion Ministries claims. The multiple eye witnesses, the allegations of physical evidence of "the real killer" being ignored by law enforcement—either crooked or inept—did not materialize. We have great sympathy for those who read only the Centurion Ministries allegations and become alarmed, because that was our experience; but those allegations were not demonstrated as true even with the very wide latitude afforded Centurion Ministries—the facts simply have not been demonstrated to be as representatives for Mr. Beach have alleged.

52

Mr. Beach's culpability has been contested vigorously and eloquently, but we have found that contest to be lacking in substance.

¶80 Applying the proper standard of review to the new evidence offered by Beach, we determine he has failed to sustain his burden of demonstrating either a freestanding claim or a gateway claim of "actual innocence." The District Court's order is reversed. Beach's petition for postconviction relief is denied and dismissed.

/S/ JIM RICE

We concur:

/S/ BETH BAKER
/S/ LAURIE McKINNON

/S/ RICHARD A. SIMONTON
District Court Judge Richard A. Simonton
sitting in place of Chief Justice Mike McGrath

Justice Laurie McKinnon, concurring.

¶81 I believe the Court's Opinion correctly resolves Beach's present appeal under the test we articulated in Beach's prior appeal, *Beach v. State*, 2009 MT 398, 353 Mont. 411, 220 P.3d 667 (*Beach I*), and I have thus signed the Opinion. However, in my view, our decision in *Beach I* confused the law governing postconviction "innocence" claims, and for this reason I would limit *Beach I*'s application to the present case. In future cases, I

53

would instead apply the legal standards and analysis set forth below. As a starting point for this discussion, I review relevant points from Beach's trial.

## I. Beach's Trial

¶82 "[I]n state criminal proceedings the trial is the paramount event for determining the guilt or innocence of the defendant." *Herrera v. Collins*, 506 U.S. 390, 416, 113 S. Ct. 853, 869 (1993). For Beach, that "paramount event" took place over a five-day period in 1984, commencing April 9 and concluding April 13.

¶83 One of the central issues at trial concerned the validity and truthfulness of Beach's confession to the crime. This was because, as prosecutor Marc Racicot conceded to the jury in closing argument, there was no reliable physical evidence retrieved from the crime scene pointing specifically to Beach as the perpetrator of Kim Nees's death. Moreover, as Racicot also conceded, the investigation had been mismanaged and certain evidence had been contaminated, thus rendering it unusable, due to improper police procedures. For instance, footprints at the crime scene were inconclusive because investigators from five different agencies had walked over the area in the course of collecting evidence, and no record had been kept of the type of shoe each officer was wearing or whether any of them had been barefoot (from wading into the river). A towel containing blood that did not match Nees or Beach had been placed in custody with other evidence, yet it was not known when and where the towel was found. Investigators had found a bloody palm print on the exterior passenger side of the pickup, but they were unable to determine who had left it. Hair evidence also had been mishandled.

¶84 Defense counsel, Charles F. "Timer" Moses, emphasized in his closing argument the lack of physical evidence tying Beach to the crime. He focused on law enforcement's careless investigative procedures and mishandling of evidence, and also criticized the prosecution's failure to produce certain evidence at trial. For example, he noted that the prosecution had failed to introduce photographs of the bloody palm print, failed to call an expert to discuss blood typing, failed to provide information about other fingerprints (not belonging to Beach) found at the scene, failed to produce photographs of the blood inside the pickup, failed to explain whether hair samples taken from Beach matched hair found at the scene, failed to produce photographs of the footprints, failed to introduce any testimony that the drag line was consistent with a garbage bag, and failed to explain the significance of the bloody towel. In short, Moses portrayed the State's case as full of holes, riddled with unexplained questions, and devoid of critical evidence.

¶85 Given the undisputed shortcomings with the physical evidence, the prosecution relied heavily on Beach's confession. Indeed, Racicot told the jurors that the confession was "the focal point of this whole inquiry." He argued that their decision in the case boiled down to two questions: "Was [the confession] voluntarily made? And is it true?" In this regard, Racicot stated that the jury had to assess the credibility of the four officers (Sergeant Via, Commander Calhoun, Lieutenant Cumming, and Deputy Medaries) who had contact with Beach when he was in custody in Louisiana and who had testified at Beach's trial about his incriminating statements. Racicot acknowledged to the jurors that if they did not believe the officers' testimony—if they found that the officers had testified

untruthfully about the circumstances surrounding Beach's confession—then the jurors should find Beach not guilty. But if they believed the officers and found that Beach's confession was voluntary and truthful, then the jurors should find Beach guilty.

¶86 Racicot and Moses addressed these questions with the jury in detail. Of particular note, Racicot argued that the confession was true because it included facts that had not been revealed to the public and that even law enforcement officers had not known at the time. Moreover, the confession included intimate and minute details about how the murder occurred, and most of those details were corroborated by independent evidence. For example, the location of blood inside and outside the pickup and the location and nature of the wounds on Nees's body were consistent with Beach's description of repeatedly hitting her with a 12-inch crescent wrench inside the pickup and then a tire iron outside the pickup. There were gouge marks in the ceiling of the pickup and on the steering wheel, which Beach presumably created when, as stated in his confession, he repeatedly struck Nees with the crescent wrench inside the pickup. Nees's father testified that when the police returned his property from the pickup, a 12-inch "chrome" crescent wrench was missing from his tool collection, which was consistent with Beach's statement that he had used a 12-inch "chrome" crescent wrench to beat Nees and had then tossed the crescent wrench (and the tire iron) into the Poplar River. Doctor Pfaff's testimony about a postmortem injury on Nees's back corroborated Beach's description of dragging Nees over to the river after killing her. The presence of blood by the pickup and by the river bank—together with the lack of blood along the drag trail between those two

points—was consistent with Beach's explanation that he had placed Nees's body in a garbage bag in order to drag her to the river. The condition in which the pickup had been found—in park, radio on, CB off, and heater on—was consistent with Beach's statement that he and Nees had been sitting in the pickup in a stationary position. Beach stated that he had removed Nees's purse from the pickup and laid it outside the pickup, which is where investigators found it. Beach stated that he had wiped his fingerprints off the vehicle, which was consistent with the fact that none of his fingerprints were found. Beach stated that he had thrown the pickup keys into the river, which was consistent with the fact that law enforcement never found the keys. Racicot argued that all of these consistencies corroborated and demonstrated the truthfulness of Beach's confession.

¶87 Moses, on the other hand, pointed to the absence of corroboration between certain details. For example, Beach had stated that he threw Nees's jacket down by her body, yet no jacket was found there when investigators arrived several hours later. The garbage bag Beach had referred to in his confession was never found either. Moses also discussed the fact that, prior to Beach's interrogation, the Louisiana officers were in contact with the Roosevelt County Sheriff's Office and received information about the circumstances of Nees's murder. Indeed, Sergeant Via admitted at trial that he had obtained background information from Montana authorities before he questioned Beach "[s]o that . . . we would know what he was talking about" during the interview and "so that [we] could ask Mr. Beach the appropriate questions." Moses suggested, however, that Beach was mentally unstable at the time of the interview and could not have given appropriate and

57

voluntary responses to the officers' questioning. Moses implied that, during the five or six hours preceding Beach's recorded statement, the officers confronted Beach with the facts and details supplied by the Roosevelt County Sheriff's Office and intimidated Beach into giving a confession which incorporated those facts and details.

¶88 The jury rejected the notion of a conspiracy among Montana and Louisiana law enforcement officials to secure a false confession from Beach. The jury implicitly credited the Louisiana officers' testimony and found that Beach's confession was both voluntary and truthful. The jury returned a verdict of guilty on the charge of deliberate homicide, finding beyond a reasonable doubt that Beach had bludgeoned Nees to death with a crescent wrench and a tire iron on June 16, 1979.

## II. Beach's Direct Appeal and First State Postconviction Petition

¶89 Beach filed a direct appeal to this Court in October 1984, raising five issues: (1) the district court lacked jurisdiction to try him for deliberate homicide; (2) the district court, after granting his first motion to change venue, erred in denying his second motion to change venue; (3) the district court erred in denying his motion to suppress his confession, since the confession was tainted by constitutional violations and procedural irregularities; (4) the district court erred in not giving the jury a particular instruction regarding mental state; and (5) the district court abused its discretion by imposing the maximum possible sentence. Beach did not argue on appeal that the evidence adduced at trial was insufficient to support his conviction of deliberate homicide. This Court

affirmed Beach's conviction, concluding that none of the issues he had raised on appeal entitled him to relief. *State v. Beach*, 217 Mont. 132, 705 P.2d 94 (1985).

¶90    Beach filed his first petition for state postconviction relief in October 1995—more than six years past the statutory deadline for filing such petitions—raising the same claims he had raised on direct appeal concerning his confession, plus a claim that his trial counsel had been ineffective. He also asserted that his confession was false. This Court determined that Beach's claims were barred, however, because they had already been decided against him on direct appeal or because he could have raised them (but did not) on direct appeal or in a timely postconviction petition. We further held that Beach had not presented any "new evidence" that would justify an equitable exception to the statute of limitations. Accordingly, we dismissed his first petition in February 1996. *Beach v. Day*, 275 Mont. 370, 913 P.2d 622 (1996).

### III.  Beach's Second State Postconviction Petition

¶91    Beach is now in his second round of postconviction proceedings in state court. He filed his second petition for state postconviction relief on January 18, 2008. This time, he pursued two separate and distinct avenues of relief, which are critical to an understanding of the legal issues presented in this case.

### A.  Statutory Exception under § 46-21-102(2), MCA

¶92    In his first avenue of relief, Beach sought to take advantage of a change in the law. Prior to 1997, a petition for postconviction relief could be filed within five years of the date of the conviction. Section 46-21-102, MCA (1995). Under this provision, Beach

had until May 1989 to file a timely postconviction petition.  In 1997, the Legislature shortened the filing period to one year from the date that the conviction becomes final.  Section 46-21-102(1), MCA (1997).  In addition, however, the Legislature enacted a new statutory exception to the deadline, allowing a claim of factual innocence to be brought in a petition filed within one year of discovering the evidence upon which such claim is predicated.  Section 46-21-102(2), MCA (1997).  Beach invoked § 46-21-102(2), MCA, as authority for bringing a claim of innocence.

¶93    In *Crosby v. State*, 2006 MT 155, 332 Mont. 460, 139 P.3d 832, we adopted a method of analysis for claims brought under § 46-21-102(2), MCA.  We first reviewed the "newly discovered evidence" test set forth in *State v. Clark*, 2005 MT 330, 330 Mont. 8, 125 P.3d 1099.  *Crosby*, ¶¶ 18-19.  That test was conceived to address a timely motion for a new trial filed by the defendant under § 46-16-702, MCA, within 30 days following a guilty verdict.  *See Clark*, ¶ 27 n. 3.  A motion for a new trial under this statute may be granted "in the interest of justice."  Section 46-16-702(1), MCA.  To prevail on such a motion grounded on newly discovered evidence, we held that the defendant must show:

> (1) The evidence must have been discovered since the defendant's trial;
> (2) the failure to discover the evidence sooner must not be the result of a lack of diligence on the defendant's part;
> (3) the evidence must be material to the issues at trial;
> (4) the evidence must be neither cumulative nor merely impeaching; and
> (5) the evidence must indicate that a new trial has a reasonable probability of resulting in a different outcome.

*Clark*, ¶ 34. We deemed it appropriate in *Crosby* to apply this five-factor test to a timely postconviction petition filed under § 46-21-102(2), MCA. *Crosby*, ¶¶ 15, 20.

¶94 In light of *Crosby*, Beach based his first avenue of relief on the *Clark* test. Also, because § 46-21-102(2), MCA, requires a claim of innocence based on newly discovered evidence to be filed within a year of discovering the evidence, Beach limited his analysis under *Clark* to the evidence he had discovered on and after January 19, 2007. He argued that this evidence established that persons other than Beach caused Nees's death. He requested that his conviction and sentence be vacated and that he be granted a new trial. Beach did not allege any constitutional claims in conjunction with this avenue of relief; he simply argued that his evidentiary showing satisfied *Clark* and warranted a new trial.

## B. Fundamental Miscarriage of Justice Exception under *Schlup*

¶95 Beach's second avenue of relief, in contrast, did involve constitutional claims. His analysis here was based on the "fundamental miscarriage of justice" exception articulated by the Supreme Court in *Schlup v. Delo*, 513 U.S. 298, 115 S. Ct. 851 (1995), and adopted by this Court in *State v. Redcrow*, 1999 MT 95, 294 Mont. 252, 980 P.2d 622, and *State v. Pope*, 2003 MT 330, 318 Mont. 383, 80 P.3d 1232. This exception is a judicially recognized doctrine that applies to situations where a convicted person seeks review of constitutional claims arising out of his original trial, but the claims are barred for procedural reasons, such as the statute of limitations or a rule prohibiting successive petitions. *Schlup*, 513 U.S. at 313-22, 115 S. Ct. at 860-64; *Sawyer v. Whitley*, 505 U.S. 333, 339, 112 S. Ct. 2514, 2518-19 (1992); *Redcrow*, ¶¶ 31-34; *Pope*, ¶¶ 51-55; *see also*

61

§§ 46-21-102(1), -105(1)(b), MCA. If the claims are barred, and if the court is persuaded that refusing to entertain them could result in a fundamental miscarriage of justice, then the court may excuse the procedural bar and review the claims on the merits.

¶96     The Supreme Court and this Court have tied "miscarriage of justice" in the present context to the postconviction petitioner's innocence. *Schlup*, 513 U.S. at 321, 115 S. Ct. at 864; *Redcrow*, ¶¶ 33-34; *Pope*, ¶ 55. This was done "[t]o ensure that the fundamental miscarriage of justice exception would remain 'rare' and would only be applied in the 'extraordinary case,' while at the same time ensuring that the exception would extend relief to those who were truly deserving." *Schlup*, 513 U.S. at 321, 115 S. Ct. at 864. As a result, "even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a [postconviction] court to reach the merits of a barred claim." *Schlup*, 513 U.S. at 316, 115 S. Ct. at 861. In addition to alleging a constitutional violation, the petitioner also must present "new evidence of innocence." *Schlup*, 513 U.S. at 316, 115 S. Ct. at 861. Restated, he must "supplement[ ] his constitutional claim with a colorable showing of factual innocence." *Kuhlmann v. Wilson*, 477 U.S. 436, 454, 106 S. Ct. 2616, 2627 (1986) (plurality). A sufficient showing of factual innocence, coupled with an alleged constitutional error in the original trial, warrants application of the miscarriage of justice exception. In essence, the exception functions as "a safety valve for the extraordinary case," *Schlup*, 513 U.S. at 333, 115 S. Ct. at 870 (O'Connor, J., concurring) (internal quotation marks omitted), where the court is persuaded that "a constitutional violation has probably resulted in the

62

conviction of one who is actually innocent," *Schlup*, 513 U.S. at 321, 115 S. Ct. at 864 (internal quotation marks omitted). In such a case, the societal interests in finality and conserving judicial resources must yield to the imperative of correcting a fundamentally unjust incarceration. *Schlup*, 513 U.S. at 320-21, 324, 115 S. Ct. at 864, 865.

¶97 Conversely, it is important to be clear that the petitioner's claim of innocence in this situation "does not by itself provide a basis for relief. Instead, his claim for relief depends critically on the validity of his [underlying constitutional] claims." *Schlup*, 513 U.S. at 315, 115 S. Ct. at 861. An adequate showing of innocence merely entitles the petitioner to receive review of those underlying claims. In this respect, demonstrating innocence is the "gateway" through which the petitioner must pass in order to have his otherwise barred constitutional claims considered on the merits. *Schlup*, 513 U.S. at 315, 115 S. Ct. at 861. If the petitioner "presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims." *Schlup*, 513 U.S. at 316, 115 S. Ct. at 861.

¶98 Based on *Schlup*, Beach alleged three constitutional errors in his original trial: (1) the State failed to disclose evidence; (2) the prosecutor misstated facts and referred to nonexistent evidence, thus denying Beach a fair trial; and (3) defense counsel rendered ineffective assistance. He argued that his new evidence of innocence was strong enough to get him through the gateway and have these barred claims reviewed on the merits. In

this regard, a court assessing a claim of actual innocence under the miscarriage of justice exception must consider "all" the evidence—old and new. *Schlup*, 513 U.S. at 327-28, 115 S. Ct. at 867; *House v. Bell*, 547 U.S. 518, 538, 126 S. Ct. 2064, 2077 (2006). For this reason, Beach did not limit his analysis, as he had in his first avenue of relief, to the evidence discovered within the preceding twelve months. Rather, he also included evidence he had discovered prior to January 19, 2007. Beach maintained that, in light of all this evidence, no reasonable juror would have found him guilty of Nees's murder.

¶99    It is important to note here that Beach did not raise a freestanding constitutional claim of innocence under *Herrera*, 506 U.S. 390, 113 S. Ct. 853. A claim of innocence under *Schlup*—which is what Beach raised—"is procedural, rather than substantive." *Schlup*, 513 U.S. at 314, 115 S. Ct. at 860. An adequate showing of innocence under *Schlup* "does not by itself provide a basis for relief"; instead, the petitioner's relief depends critically on the validity of his underlying constitutional claims. *Schlup*, 513 U.S. at 315, 115 S. Ct. at 861. For Beach, the State's withholding of evidence, the prosecutorial misconduct at trial, and the ineffectiveness of defense counsel are the substantive claims; his showing of innocence is simply the procedural prerequisite for obtaining review of those otherwise barred claims.

¶100   In contrast, a substantive or "freestanding" claim of innocence provides a basis for relief by itself. A substantive innocence claim does not allege constitutional violations at trial; to the contrary, it presumes that the underlying proceedings were "entirely fair and error free." *Schlup*, 513 U.S. at 314, 115 S. Ct. at 860. The theory behind a substantive

64

claim is that, although the trial proceedings were fair and error free, newly discovered evidence shows that the petitioner's conviction is factually incorrect, and his execution or continued imprisonment would thus violate the Constitution. *House*, 547 U.S. at 554, 126 S. Ct. at 2086; *Schlup*, 513 U.S. at 313-17, 115 S. Ct. at 860-62; *Herrera*, 506 U.S. at 404, 417, 113 S. Ct. at 862, 869. Here, as noted, Beach did not claim that his trial was fair and error free. To the contrary, he asserted in his brief that "the new evidence discovered in this case, combined with correcting errors which occurred in the original trial, would result in Mr. Beach's acquittal" under *Schlup*.

## C. The State's Response and the District Court's Order

¶101 The State moved to dismiss Beach's petition. As to his first avenue of relief, the State contended that Beach could not rely on § 46-21-102(2), MCA, to present his newly discovered evidence because the 1997 Legislature limited the applicability of this provision to convictions that became final after April 24, 1996. *See* Laws of Montana, 1997, ch. 378, §§ 9(1), 10. Since Beach's conviction became final in 1985,[1] the State argued that he remained subject to the pre-1997 five-year limitations period, making his January 2008 petition time barred. *See Morrison v. Mahoney*, 2002 MT 21, ¶ 11, 308 Mont. 196, 41 P.3d 320. As to Beach's second avenue of relief under *Schlup*, the State argued that his new evidence "is not reliable nor is it compelling of either Beach's innocence or someone else's guilt."

---

[1] Under the statutory definition, Beach's conviction became final once this Court issued its decision in his direct appeal and the time for petitioning the United States Supreme Court for review expired. Section 46-21-102(1), MCA (1997).

¶102 The District Court dismissed Beach's petition in March 2008. In its one-page order, the court noted that the petition was procedurally and time barred, and that Beach's proffered evidence "does not warrant a finding of actual innocence in support of the fundamental miscarriage of justice exemption [sic] to the time requirements."

## IV. *Beach I*

¶103 Beach appealed to this Court, which issued its decision in November 2009. We agreed with the State that Beach could not proceed under § 46-21-102(2), MCA, because his conviction became final before the statute's effective date. *Beach I*, ¶¶ 21-22. This conclusion disposed of Beach's first avenue of relief.

¶104 Since Beach was subject to pre-1997 law, which provided a five-year statute of limitations with no statutory exception for newly discovered evidence, and since Beach's January 2008 petition was thus untimely, we held that he could escape the time bar and obtain review of his claims "only if he can satisfy the fundamental miscarriage of justice exception." *Beach I*, ¶ 24. This was the second avenue of relief Beach had argued in support of his petition. Although the District Court concluded that Beach did not satisfy the miscarriage of justice exception, we observed that the court "failed to discuss . . . the legal standard that it had applied." *Beach I*, ¶ 25. We thus deemed it necessary to remand the case to the District Court with instructions to conduct an evidentiary hearing and to evaluate Beach's evidence under "the correct legal standard." *Beach I*, ¶ 51. The problem, in my view, and thus my concern about *Beach I*'s precedential value, is that our opinion did not set forth the correct legal standard.

¶105   This Court previously adopted the "gateway innocence" framework from *Schlup* as the standard for determining whether a fundamental miscarriage of justice exists. *Redcrow*, ¶¶ 33-34, 37; *Pope*, ¶¶ 55-59, 67-69.   To pass through the gateway and argue the merits of his underlying constitutional claims, Beach had to show that, in light of new reliable evidence, it is more likely than not that no reasonable juror would have voted to find him guilty beyond a reasonable doubt.  *Schlup*, 513 U.S. at 324, 327, 329, 115 S. Ct. at 865, 867, 868.   The District Court, in turn, had to consider all the evidence—Beach's new evidence, as well as the evidence adduced at his 1984 trial—and make a probabilistic determination about what reasonable, properly instructed jurors would do based on the overall record.  *House*, 547 U.S. at 537-38, 126 S. Ct. at 2077.

¶106   We did not direct the District Court to apply this well-considered approach, however.  Rather, we fashioned a new test composed of elements from *Clark*, *Schlup*, and *Sawyer* and directed the District Court to apply it instead.  *Beach I*, ¶¶ 37-48, 51.   Under law-of-the-case principles, the District Court and this Court are constrained to apply the *Beach I* test to Beach's petition;[2] and, as noted at the outset, I believe the Court has resolved Beach's present appeal under that test correctly.  Nevertheless, *Beach I*'s new test lacks precedential support, and I fear that in devising it we have confused the law.

---

[2] "When this Court, in deciding a case presented, states a principle or rule of law necessary to the decision, such pronouncement becomes the law of the case and must be adhered to throughout its subsequent progress, both in the trial court and upon subsequent appeal." *Winslow v. Mont. Rail Link, Inc.*, 2005 MT 217, ¶ 30, 328 Mont. 260, 121 P.3d 506.  "This doctrine expresses the practice of courts generally to refuse to reopen what has been decided." *State v. Wagner*, 2013 MT 47, ¶ 18, 369 Mont. 139, 296 P.3d 1142 (internal quotation marks omitted).

For purposes of clarification, therefore, I shall explain three specific areas where I believe the *Beach I* analysis is incorrect or problematic, and set forth what in my view are the correct legal principles that should apply in future cases.

## A. Reliance on *Clark*

¶107   First, the *Beach I* test is based primarily on *Clark*. *See Beach I*, ¶¶ 37-38, 47-48. However, *Clark* did not involve the question whether the fundamental miscarriage of justice exception should be applied to a procedural bar. The five-factor *Clark* test was conceived to address a timely motion for a new trial under § 46-16-702, MCA. *See Clark*, ¶ 27 n. 3. The *Clark* test contemplates a defendant who files a motion for a new trial, based on newly discovered evidence, within 30 days following a guilty verdict. *See Clark*, ¶ 34; § 46-16-702(2), MCA; *see also* Br. of Respt. at 3, *State v. Clark*, http://searchcourts.mt.gov/index.html (Mont. Aug. 4, 2004) (No. 04-282) (reciting that Clark filed his motion for a new trial 30 days after the jury's verdict).

¶108   A *Clark* defendant, therefore, is situated quite differently than a *Schlup* petitioner. A *Clark* defendant has only recently been convicted, and new evidence has been discovered since his trial. The new evidence is itself the basis for relief. If the evidence indicates that a new trial would have "a reasonable probability of resulting in a different outcome" (and if the other factors of the *Clark* test, such as diligence, are met), then the *Clark* defendant is entitled to a new trial. *Clark*, ¶ 34.

¶109   A *Schlup* petitioner, on the other hand, is years—perhaps decades—beyond the date of his conviction. His time for filing a motion for a new trial under § 46-16-702,

MCA, has long passed, as has his time for pursuing a direct appeal. He is even barred from challenging his conviction through postconviction proceedings—unless he shows a fundamental miscarriage of justice. Unlike a *Clark* defendant's new evidence, which is itself the basis for relief, a *Schlup* petitioner's new evidence "does not by itself provide a basis for relief"; rather, his claim for relief is premised on constitutional errors in his original trial. *Schlup*, 513 U.S. at 315, 115 S. Ct. at 861. A *Schlup* petitioner offers new evidence in order to escape the procedural bar, i.e., "to pass through the gateway and argue the merits of his underlying claims." *Schlup*, 513 U.S. at 316, 115 S. Ct. at 861. He must show "that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup*, 513 U.S. at 327, 115 S. Ct. at 867. Only if the *Schlup* petitioner makes a sufficient showing of innocence *and* prevails on the merits of his underlying constitutional claim(s) is he then entitled to relief.

¶110 Seen in this light, the *Clark* test is plainly inapposite to a *Schlup* petitioner, and I believe we were wrong to make *Clark* the basis of the miscarriage of justice test in *Beach I*. It is true (*see Beach I*, ¶ 40) that we deemed it appropriate to apply the *Clark* factors to a postconviction petition alleging newly discovered evidence in *Crosby*, ¶ 20, and in *State v. Abe*, 2001 MT 260, ¶¶ 8-13, 307 Mont. 233, 37 P.3d 77. But in these two cases, we were not concerned with the miscarriage of justice exception, since Crosby and Abe could file their petitions under § 46-21-102(2), MCA. *Crosby*, ¶ 15; *Abe*, ¶¶ 6-8. Thus, *Crosby* and *Abe* were not authority to apply the *Clark* test to someone, like Beach, who (1) is not entitled to rely on § 46-21-102(2), MCA, and (2) has presented his newly

discovered evidence not as a basis for relief, but as a basis for passing through the actual innocence gateway and arguing the merits of his trial-based constitutional claims.

## B. Substantive versus Procedural Innocence Claims

¶111 My second point relates to our discussion of substantive versus procedural claims. We stated that the miscarriage of justice exception "concerns actual, or substantive innocence, rather than legal, or procedural innocence." *Beach I*, ¶ 31. We also stated that "the 'actual innocence' inquiry may involve the interplay of substantive *and* procedural innocence claims." *Beach I*, ¶ 43 (emphasis in original). In this connection, we indicated that once a petitioner shows actual innocence sufficient to pass through the procedural gateway, he may then (1) pursue relief for alleged constitutional errors in his original trial or (2) demonstrate his substantive innocence.[3] *Beach I*, ¶¶ 32-36, 43-45. Regrettably, this conception of substantive and procedural claims missed the mark and is prone to generate confusion.

¶112 It is true that the miscarriage of justice exception is concerned with "actual innocence," as distinct from "legal innocence." This distinction was mentioned in

---

[3] This is explicit in our discussion of Beach's claims (*Beach I*, ¶¶ 44-45) but more subtle in our discussion of *Pope* (*Beach I*, ¶¶ 33-36). After Pope successfully passed through the gateway, the State conceded his constitutional claims, and we thus remanded for a new trial. *Pope*, ¶¶ 67-68, 70. In *Beach I*, we reasoned that the State's concession "obviated the need to evaluate whether Pope's newly discovered evidence demonstrated his substantive actual innocence." *Beach I*, ¶ 35. (Notably, Pope had "not made a substantive claim that the DNA evidence proves that he is truly innocent." *Pope*, ¶ 55.) We then suggested that Beach and Pope are similar in that they both relied on new evidence to pass through the gateway, but that they are different in that, once through the gateway, Pope obtained relief for alleged trial-based constitutional violations whereas Beach seeks relief based on his substantive innocence. *Beach I*, ¶¶ 36, 44.

*Sawyer*, 505 U.S. at 339-40, 112 S. Ct. at 2518-19, and can be traced back to *Smith v. Murray*, 477 U.S. 527, 537-38, 106 S. Ct. 2661, 2668 (1986). Stated concisely, " 'actual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623-24, 118 S. Ct. 1604, 1611 (1998). "A prototypical example of 'actual innocence' in a colloquial sense is the case where the State has convicted the wrong person of the crime." *Sawyer*, 505 U.S. at 340, 112 S. Ct. at 2519. "Legal innocence," in contrast, refers to a legal error in the trial that by itself requires reversal. *Gandarela v. Johnson*, 286 F.3d 1080, 1085 (9th Cir. 2002); *Johnson v. Hargett*, 978 F.2d 855, 859-60 (5th Cir. 1992). The miscarriage of justice exception applies only to a petitioner who demonstrates actual, factual innocence, not mere legal innocence. Indeed, that is the exception's purpose: to permit review of an otherwise barred claim where the court is convinced that a constitutional violation has probably resulted in the conviction of one who is actually innocent. *Schlup*, 513 U.S. at 321, 115 S. Ct. at 864.

¶113 But to say that the exception concerns "substantive innocence, rather than . . . procedural innocence," *Beach I*, ¶ 31, is confusing, as is the notion of an "interplay" between substantive and procedural innocence claims, *Beach I*, ¶¶ 36, 43-45. A claim of innocence, for purposes of the miscarriage of justice exception, "is procedural, rather than substantive." *Schlup*, 513 U.S. at 314, 115 S. Ct. at 860. It is the mechanism by which the petitioner (if his showing of innocence is sufficient) may obtain review of an otherwise barred allegation of constitutional error in his original trial. A petitioner who shows actual innocence under the procedural/gateway standard has, in effect, established

71

that the miscarriage of justice exception should apply to him and that his trial-based claim should be reviewed on its merits.

¶114 A substantive claim of innocence, on the other hand, is an independent avenue of relief apart from the miscarriage of justice exception. *Herrera*, 506 U.S. at 404-05, 113 S. Ct. at 862-63; *Carriger v. Stewart*, 132 F.3d 463, 477 (9th Cir. 1997) (en banc). The confusion arises because both claims—procedural and substantive—require a showing of "actual innocence" based on new evidence (with the substantive claim requiring "more convincing proof of innocence" than the procedural claim). *House*, 547 U.S. at 555, 126 S. Ct. at 2087; *Carriger*, 132 F.3d at 477. But the essential distinction is this: A sufficient showing of actual innocence under a substantive claim is a basis for relief by itself, whereas a sufficient (but lesser) showing of actual innocence under a procedural claim is a basis for escaping a procedural bar on an underlying constitutional claim. *Schlup*, 513 U.S. at 313-15, 115 S. Ct. at 860-61. A successful substantive claim results in exoneration, whereas a successful procedural claim leads to judicial review of a trial-based constitutional claim which, if meritorious, then results in the grant of a new trial. *See* Opinion, ¶¶ 13, 14, 16.

### C. Standard of Proof

¶115 My final point concerns the standard of proof. For substantive claims, we stated that "Beach must show by clear and convincing evidence that, but for a procedural error, no reasonable juror would have found him guilty of the offense." *Beach I*, ¶ 44. For

procedural claims, we stated that Beach must satisfy a modified version of the *Clark* test. *Beach I*, ¶¶ 45-48. I believe both standards are incorrect.

### 1. Standard for Substantive Claims

¶116 The "clear and convincing" standard we articulated in *Beach I* for substantive innocence claims can be traced to *Sawyer*. In that opinion, the Supreme Court examined the miscarriage of justice exception as applied to a petitioner who claimed that he was "actually innocent of the death penalty." Sawyer had filed a petition seeking review of constitutional claims relating to his sentence, but the claims were procedurally barred. Hence, the issue was what showing he had to make in order to satisfy the miscarriage of justice exception. The Supreme Court held that he "must show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." *Sawyer*, 505 U.S. at 336, 112 S. Ct. at 2517.

¶117 The Supreme Court adopted this standard for a *procedural* innocence claim related to a petitioner's death sentence, not a *substantive* innocence claim related to a petitioner's conviction. *See Sawyer*, 505 U.S. at 347-50, 112 S. Ct. at 2523-25; *Schlup*, 513 U.S. at 324-26, 115 S. Ct. at 865-67. As to the latter, the Supreme Court has indicated that a substantive/freestanding claim—assuming such claims are cognizable[4]—would require "more convincing proof of innocence" than a procedural/gateway claim; indeed, "the threshold for any hypothetical freestanding innocence claim [would be] 'extraordinarily

---

[4] The Supreme Court has only assumed, for the sake of argument, that substantive claims of innocence are possible under the federal Constitution. *House*, 547 U.S. at 554-55, 126 S. Ct. at 2086-87; *Herrera*, 506 U.S. at 417, 113 S. Ct. at 869.

high.' " *House*, 547 U.S. at 555, 126 S. Ct. at 2087 (quoting *Herrera*, 506 U.S. at 417, 113 S. Ct. at 869). With a freestanding claim—where there is no question about the fairness of the original trial—the new evidence must "unquestionably establish [the petitioner's] innocence." *Schlup*, 513 U.S. at 316-17, 115 S. Ct. at 862. With a gateway claim, on the other hand, the new evidence need only "raise[ ] sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial without the assurance that that trial was untainted by constitutional error." *Schlup*, 513 U.S. at 316-17, 115 S. Ct. at 862. The showing for a gateway claim is lower because

> a petitioner claiming he falls within the miscarriage of justice exception asserts constitutional error at trial, [and thus] his conviction is not entitled to the same degree of respect as one concededly free of constitutional taint. Accordingly, a petitioner asserting both innocence and constitutional error "need carry less of a burden" with respect to innocence than a petitioner like Herrera who claimed only innocence.

*Carriger*, 132 F.3d at 477-78 (citing *Schlup*, 513 U.S. at 316, 115 S. Ct. at 861).

¶118 *Beach I*'s articulation of the showing required for a substantive innocence claim does not accurately reflect the high standard applicable to such claims. "[A] standard of proof represents an attempt to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." *Schlup*, 513 U.S. at 325, 115 S. Ct. at 866 (internal quotation marks omitted). In *Carriger*, the Ninth Circuit concluded that a petitioner asserting a substantive/freestanding innocence claim "must go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent." 132 F.3d at 476. The

74

court cited Justice Blackmun's *Herrera* dissent as the origin of this standard.[5]  Justice

Blackmun, in turn, discussed two considerations that support the standard:

> First, new evidence of innocence may be discovered long after the defendant's conviction.  Given the passage of time, it may be difficult for the State to retry a defendant who obtains relief from his conviction or sentence on an actual-innocence claim.  The actual-innocence proceeding thus may constitute the final word on whether the defendant may be punished.  In light of this fact, an otherwise constitutionally valid conviction or sentence should not be set aside lightly.  Second, conviction after a constitutionally adequate trial strips the defendant of the presumption of innocence.  The government bears the burden of proving the defendant's guilt beyond a reasonable doubt, but once the government has done so, the burden of proving innocence must shift to the convicted defendant.  The actual-innocence inquiry is therefore distinguishable from review for sufficiency of the evidence, where the question is not whether the defendant is innocent but whether the government has met its constitutional burden of proving the defendant's guilt beyond a reasonable doubt.  When a defendant seeks to challenge the determination of guilt after he has been validly convicted and sentenced, it is fair to place on him the burden of proving his innocence, not just raising doubt about his guilt.

*Herrera*, 506 U.S. at 442-43, 113 S. Ct. at 882-83 (Blackmun, Stevens, & Souter, JJ.,

dissenting) (citations omitted).  Notably, Justice Blackmun rejected the *Sawyer* standard

as ill-suited to the substantive innocence inquiry.  *Herrera*, 506 U.S. at 442 & n. 6, 113

S. Ct. at 882 & n. 6 (Blackmun, Stevens, & Souter, JJ., dissenting).

---

[5] In the *Herrera* majority opinion, Chief Justice Rehnquist only assumed, for the sake of argument, that a substantive innocence claim is cognizable, and he thus did not articulate the standard for such a claim, except to note that it would be "extraordinarily high."  *Herrera*, 506 U.S. at 417, 113 S. Ct. at 869.  Justice Blackmun, on the other hand, concluded that a substantive claim is cognizable, and he thus articulated what showing he believed is necessary to obtain relief under it.  *Herrera*, 506 U.S. at 437, 441-44, 113 S. Ct. at 880, 882-83 (Blackmun, Stevens, & Souter, JJ., dissenting).

¶119 To summarize this discussion, the *Herrera* Court contemplated an "extraordinarily high" standard for a freestanding innocence claim. 506 U.S. at 417, 113 S. Ct. at 869. Likewise, the *Schlup* Court indicated that such a claim would fail unless the petitioner's new evidence "unquestionably establish[es]" his innocence. 513 U.S. at 316-17, 115 S. Ct. at 862. A petitioner raising a substantive claim of innocence concedes that his conviction was the product of a fair and error-free trial. The government has proved his guilt beyond a reasonable doubt, and he has thus been stripped of the presumption of innocence. If successful on his substantive claim, the petitioner is forever exonerated and the State may not retry him (*see* Opinion, ¶ 13). In light of these considerations, it seems apparent that we understated the appropriate standard of proof for a substantive claim in *Beach I*, ¶ 44. It is not enough to show (even by clear and convincing evidence) that no reasonable juror would have found the petitioner guilty.[6] To prevail on a substantive claim, the petitioner must go beyond raising doubt about his guilt; he must affirmatively, and unquestionably, establish his innocence. Moreover, he must do so based on reliable new evidence and in light of the proof of his guilt at trial. *Herrera*, 506 U.S. at 417-19, 113 S. Ct. at 869-70. I would overrule *Beach I* and apply the foregoing standard—which, I note, is consistent with our recognition in *Pope*, ¶¶ 48-49, that while a *Schlup* petitioner "only has to be successful in convincing the reviewing court that a reasonable jury would

---

[6] For this reason, I would not apply the standard for freestanding claims stated at ¶ 13, ¶ 16, and ¶ 26 n. 4 of today's Opinion in future cases.

not likely convict him in light of the new evidence," a *Herrera* petitioner "must present new evidence that proves he or she did not commit the crime."

## 2. Standard for Procedural Claims

¶120   As noted, we adopted a modified version of the *Clark* test as the framework for analyzing a procedural innocence claim. *Beach I*, ¶¶ 45-48. For the reasons already discussed, the *Clark* test was not envisioned to be used as a fundamental miscarriage of justice test, and it should not be applied for that purpose. *See* ¶¶ 107-110, *supra*.

¶121   As for the specific showing needed to prevail on a procedural/gateway claim, we opined in *Beach I* that *Schlup*, *Redcrow*, and *Clark* articulate "rough[ly] equivalen[t]" standards, and we thus directed the District Court to apply *Schlup* and *Redcrow* as part of *Clark*'s fifth factor. *Beach I*, ¶¶ 45, 48, 51. I do not agree that the standards from these three cases are equivalent, nor do I agree that they can or should be fused into one.

¶122   First, under the fifth factor of *Clark*, "the evidence must indicate that a new trial has a reasonable probability of resulting in a different outcome." *Clark*, ¶ 34. Under *Schlup*, conversely, the petitioner must show that it is "more likely than not" that "no juror, acting reasonably, would have voted to find him guilty." *Schlup*, 513 U.S. at 327, 329, 115 S. Ct. at 867, 868. We explained in *Clark*, ¶ 36, that the "reasonable probability" standard is lower than the "more likely than not" standard (albeit, using the terms "probably" and "51 percent or greater chance" in lieu of "more likely than not"). The Supreme Court has made similar observations. *Schlup*, 513 U.S. at 327 & n. 45, 115 S. Ct. at 867 & n. 45; *Schlup*, 513 U.S. at 332-33, 115 S. Ct. at 870 (O'Connor, J.,

concurring). Showing "a reasonable probability of . . . a different outcome" is sufficient for granting a new trial to a defendant who files a motion within 30 days after a guilty verdict. But it is wholly insufficient for finding a fundamental miscarriage of justice that would warrant review of procedurally barred constitutional claims asserted years after the conviction. The miscarriage of justice exception must remain "rare" and be applied only in the "extraordinary case." *Schlup*, 513 U.S. at 321, 115 S. Ct. at 864.

¶123 Second, in *Redcrow*, we applied the foregoing *Schlup* standard in our evaluation of the petitioner's claims. *Redcrow*, ¶ 37. But near the end of that same paragraph, we then stated: "A fundamental miscarriage of justice arises only when a jury could find, in light of new evidence, that the defendant is actually innocent of the crime." *Redcrow*, ¶ 37. This is the language adopted at ¶¶ 48 and 51 of *Beach I*. The question at the gateway stage, however, is not whether "a jury could find . . . that the defendant is actually innocent." *Redcrow*, ¶ 37. It is whether "any reasonable juror would have reasonable doubt." *House*, 547 U.S. at 538, 126 S. Ct. at 2077. The gateway analysis focuses on what reasonable jurors *would* do, not what a jury *could* do. *See Schlup*, 513 U.S. at 330, 115 S. Ct. at 868 (distinguishing the standard governing claims of insufficient evidence— i.e., whether any rational juror *could* have convicted—from the standard governing *Schlup*—i.e., whether no reasonable juror *would* have convicted; the former focuses on "the power" of the trier of fact to reach its conclusion, while the latter focuses on "the likely behavior" of the trier of fact). The quoted language from *Redcrow*, ¶ 37, is not a correct statement of the law under *Schlup*'s gateway innocence standard.

78

¶124 Of course, in defining "fundamental miscarriage of justice" under Montana law, we are not required to adopt the same approach applied by the Supreme Court in federal habeas cases. Nevertheless, we purported to adopt the *Schlup* standard in *Redcrow* and *Pope*. In so doing, we indicated that "[t]he Supreme Court's definition of fundamental miscarriage of justice comports with" our longstanding recognition of "the importance of applying procedural bars regularly and consistently." *Redcrow*, ¶ 34. In my view, *Schlup*'s gateway approach is sensible and well-considered, and I would adhere to that approach in cases where a postconviction petitioner seeks to escape a procedural bar and obtain review of otherwise barred constitutional claims. When we inject into the analysis other standards and tests that were created for different purposes, we engender confusion and undermine *Schlup*'s clear analytical framework. For these reasons, I would overrule the *Beach I* test in its entirety and reaffirm the analytical approach set forth in *Schlup*.

### D. Summary

¶125 In sum, a postconviction petitioner who alleges constitutional errors in his original trial, but who is procedurally barred from bringing those claims, must demonstrate a fundamental miscarriage of justice in order to receive review of his claims on the merits. To do so, the petitioner must supplement his constitutional claims with a sufficient showing of factual innocence (as distinct from legal innocence). More specifically, the petitioner must come forward "with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324, 115 S. Ct. at 865. The petitioner

79

must show that, in light of this new evidence, it is more likely than not that no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt. *Schlup*, 513 U.S. at 327, 329, 115 S. Ct. at 867, 868.

¶126 The reviewing court, in turn, must examine all the evidence—old and new, incriminating and exculpatory—without regard to whether it would necessarily be admitted under the rules of admissibility that govern at trial.[7] Based on this total record, the court must make a probabilistic determination about what reasonable, properly instructed jurors would do. *Schlup*, 513 U.S. at 327-29, 115 S. Ct. at 867-68; *House*, 547 U.S. at 538, 126 S. Ct. at 2077. The court's function is not to make an independent factual determination about what likely occurred; rather, it is to assess how reasonable jurors likely would react to the overall, newly supplemented record. *House*, 547 U.S. at 538, 126 S. Ct. at 2077-78. While the standard is demanding, it does not require absolute certainty about guilt or innocence. The petitioner's burden at the gateway stage "is to demonstrate that more likely than not, in light of the new evidence, . . . any reasonable juror would have reasonable doubt." *House*, 547 U.S. at 538, 126 S. Ct. at 2077. If the petitioner makes this showing, then the court will review his constitutional claims on the

---

[7] On this particular point, I believe our refusal in *Pope* to consider the petitioner's confessions to the crime—one in a sworn statement; the other in open court—was error. *See Pope*, ¶¶ 6-10, 62. The State had promised not to use Pope's confessions against him, but that did not preclude this Court from considering the confessions in determining whether he was "actually innocent" of the crime. By limiting our consideration of that question to "only admissible evidence," *Pope*, ¶ 63, we violated *Schlup*'s command that the court consider *all* the evidence. Since the question is whether the petitioner is factually innocent, I agree with Justice Rice that the confessions were evidence of Pope's guilt that should have been considered. *Pope*, ¶ 89 (Rice, J., & Gray, C.J., dissenting).

merits in a postconviction proceeding from which he previously was procedurally barred. If he prevails on his constitutional claims, then the petitioner is entitled to a new trial.

¶127 Distinct from this procedural/gateway innocence framework, a petitioner may seek relief under a substantive/freestanding claim of innocence. There, the petitioner does not allege constitutional errors in his trial; he concedes that the proceedings underlying his conviction and sentence were "entirely fair and error free." *Schlup*, 513 U.S. at 314, 115 S. Ct. at 860. He instead claims that his conviction is factually incorrect and that his execution or continued imprisonment would thus violate the Constitution. This requires "more convincing proof of innocence" than the gateway innocence standard requires. *House*, 547 U.S. at 555, 126 S. Ct. at 2087. The petitioner must go beyond raising doubt about his guilt and must establish his innocence affirmatively, and unquestionably, based on reliable new evidence and in light of the proof of his guilt at trial. *Schlup*, 513 U.S. at 316-17, 115 S. Ct. at 862; *Herrera*, 506 U.S. at 417-19, 113 S. Ct. at 869-70; *Carriger*, 132 F.3d at 476.

¶128 Finally, the question arises as to how § 46-21-102(2), MCA, is to be applied consistently with the *Schlup* and *Herrera* analyses in cases where § 46-21-102(2), MCA, is available to the petitioner. This section states:

> A claim that alleges the existence of newly discovered evidence that, if proved and viewed in light of the evidence as a whole would establish that the petitioner did not engage in the criminal conduct for which the petitioner was convicted, may be raised in a petition filed within 1 year of the date on which the conviction becomes final or the date on which the

81

petitioner discovers, or reasonably should have discovered, the existence of the evidence, whichever is later.

Section 46-21-102(2), MCA.

¶129 As discussed, we deemed it appropriate in *Crosby* to apply the *Clark* test to a timely petition filed under this section. *Crosby*, ¶¶ 15, 20. In light of the foregoing discussion of "actual innocence" claims, however, I question whether the *Clark* test is properly suited to analyzing such a petition. Under *Clark*, the defendant must show:

> (1) The evidence must have been discovered since the defendant's trial;
> (2) the failure to discover the evidence sooner must not be the result of a lack of diligence on the defendant's part;
> (3) the evidence must be material to the issues at trial;
> (4) the evidence must be neither cumulative nor merely impeaching; and
> (5) the evidence must indicate that a new trial has a reasonable probability of resulting in a different outcome.

*Clark*, ¶ 34. These factors bear on whether a new trial should be granted under § 46-16-702, MCA (the "new trial" statute); § 46-21-102(2), MCA, on the other hand, says nothing about a new trial. The *Clark* test, moreover, requires only a reasonable probability that a new trial will result in a different outcome; § 46-21-102(2), MCA, conversely, requires the petitioner's evidence to "establish" that he did not engage in the criminal conduct for which he was convicted. The *Clark* test requires the court to assess the defendant's diligence; § 46-21-102(2), MCA, however, has its own diligence standard: the petition is timely if it is filed within one year of the date on which the conviction became final or the date on which the petitioner discovered, or reasonably

should have discovered, the existence of the evidence, whichever is later. The *Clark* test requires the evidence to be material to the issues at trial and not cumulative or merely impeaching; § 46-21-102(2), MCA, states no such criteria. In short, the *Clark* test and § 46-21-102(2), MCA, require distinct showings for differently situated individuals.

¶130 I note that the legislative history of § 46-21-102(2), MCA, while somewhat thin, is consistent with this conclusion. As originally proposed, House Bill 222 (1997) reduced the time limit on filing a petition for postconviction relief to one year, with no exceptions. Opponents of the bill argued that this categorical limitation ignored recent developments in DNA testing and would prevent courts from considering cases in which DNA testing proved unequivocally that the petitioner was innocent. Apparently in response to such objections, the House Judiciary Committee amended House Bill 222 to incorporate the "newly discovered evidence" exception now contained at § 46-21-102(2), MCA.

¶131 Based on the statute's language, it appears § 46-21-102(2), MCA, is effectively— though perhaps not intentionally—a codification of the substantive/freestanding claim that the Supreme Court in *Herrera* (and again in *House*) only assumed, for the sake of argument, is cognizable under the federal Constitution and that this Court, likewise, has assumed exists but has never actually relied on to grant relief. An obvious difference is the one-year filing deadline in § 46-21-102(2), MCA. Neither the Supreme Court nor this Court specified whether a substantive innocence claim under the Constitution[8] must be

---

[8] Justice Blackmun concluded in *Herrera* that a substantive innocence claim is cognizable under the Cruel and Unusual Punishments Clause of the Eighth Amendment

filed within a particular timeframe of discovering the new evidence. I do not believe it is necessary to resolve that question here, however. Until such time as it is necessary to decide whether the statute's one-year limit should not control constitutional-based claims as well, I would avoid further complicating an already complex area of law and simply apply the above-stated standards for a substantive claim of innocence whether it is brought under the Constitution or under § 46-21-102(2), MCA. Thus, the petitioner must affirmatively and unquestionably establish his innocence, based on reliable new evidence discovered within the twelve months preceding the filing of his petition and in light of the proof of his guilt at trial.

### V. Discussion of Beach's Claim

¶132 The Court persuasively explains why Beach's new evidence fails to satisfy the threshold requirement of the foregoing tests—specifically, his evidence is not "reliable." Opinion, ¶¶ 23, 68-78. I agree with that analysis and join it. I also offer the following additional observations as to why Beach's claims must fail.

### A. Substantive Innocence

¶133 Under the "extraordinarily high" standard required for a substantive/freestanding claim of innocence, simply pointing the finger at other possible perpetrators—as Beach has attempted to do here, based largely on hearsay—is inadequate. Likewise, attempting to poke holes in one's confession to the crime—as Beach has also attempted here, using

and under the Due Process Clause of the Fourteenth Amendment. 506 U.S. at 430-37, 113 S. Ct. at 876-80 (Blackmun, Stevens, & Souter, JJ., dissenting). These correspond with Article II, Sections 22 and 17, respectively, of the Montana Constitution.

the same arguments he made (and the jury rejected) in his 1984 trial—does not establish affirmatively and unquestionably that the petitioner is innocent. There is no DNA or other scientific evidence proving that Beach did not commit the crime. There is no trustworthy alibi evidence establishing that Beach was in another location when the crime occurred. There is no confession, let alone a reliable one, by another individual stating that he or she committed the crime and that Beach did not. The jury in Beach's trial found beyond a reasonable doubt that Beach bludgeoned Nees to death with a crescent wrench and a tire iron. Even assuming[9] that Beach raised a substantive innocence claim—i.e., that his conviction, although the product of a fair and error-free trial, is nevertheless factually incorrect—Beach's evidence falls far short of proving that claim.

### B. Procedural Innocence

¶134 In conducting our analysis at the gateway stage we must decide, based on all the evidence, whether it is more likely than not that no reasonable juror would have voted to find Beach guilty beyond a reasonable doubt. With that standard in mind, I cannot agree with Beach's contention that his new evidence sufficiently establishes his actual innocence. Beach confessed to the crime. He did not simply say, "I did it." Rather, he provided intimate and minute details of exactly how he committed the crime and then disposed of the evidence. With perhaps one exception (the description of what Nees was wearing that night), the details of his confession were consistent with the crime scene.

---

[9] Contrary to statements in *Beach I* that Beach brought "both substantive and procedural" innocence claims in his January 2008 petition, *see Beach I*, ¶¶ 43, 44, he actually raised only a procedural claim under *Schlup*, *see* ¶¶ 99-100, *supra*.

Opinion, ¶ 29 n. 6. Importantly, Beach provided details that investigators previously were unaware of. For instance, he stated that he used a garbage bag when dragging Nees's body to the river, which explained the lack of blood along the drag trail. While Beach posits that the Louisiana officers planted such details of the crime in his head, the transcript of a telephone conversation between Sheriff Mahlum and Sergeant Via reflects that Beach himself provided the details.[10] For example, Mahlum wanted to know exactly where Beach had thrown the pickup keys into the river. Beach replied that he had thrown the keys to his right, as he was facing Nees's body, which meant upstream.

¶135 Contrary to Beach's insinuations that Mahlum and the Louisiana officers engaged in a conspiracy to coerce him into giving a false confession to a crime he did not commit, there is no evidence substantiating this claim, let alone *new* evidence that the jury did not already consider when it rejected this theory back in 1984. Furthermore, Beach has never provided a coherent and consistent explanation as to why he—a supposedly innocent man—confessed to brutally murdering Nees. Beach has gone from alleging that Calhoun told him he would "fry in the electric chair" if he did not confess, to claiming that the officers threatened him with homosexual advances, to contending that he sought only to please the officers so he could be returned to Montana, to asserting that he felt helpless after being held incommunicado for several days. Beach even offered the theory that the

[10] Following his confession, Beach asked to speak with Mahlum. Via got in touch with Mahlum and then put Beach on the line. Beach asked Mahlum "to kinda keep it away from my mother till I get a chance to talk to her" because "[s]he'll take it pretty hard." Thereafter, Via and Mahlum spoke without Beach on the line, though it appears that Beach was close enough to provide answers, through Via, to Mahlum's questions.

officers drugged his milkshake while he was being fed before his confession; yet, he also alleged the contrary theory that he had not been fed and was suffering from extreme hunger at the time of his confession. Bottom line: Beach's theories of why he confessed are inconsistent and continually evolving, which serves only to undermine the credibility of all of them. More to the point, Beach has never presented a shred of credible evidence substantiating any of his explanations for giving a supposedly false confession.

¶136 The Supreme Court's opinion in *House* provides insight into the sort of showing necessary to pass through the gateway and obtain review of barred constitutional claims. Not even the DNA evidence calling into question House's involvement in the crime and the "evidentiary disarray" surrounding the blood evidence were enough to overcome the prosecution's evidence against him. *House*, 547 U.S. at 540-48, 126 S. Ct. at 2078-83. The Supreme Court also considered compelling evidence that another suspect had murdered the victim—in particular, the victim's husband. Two witnesses had provided credible testimony that the husband actually confessed to the crime; two more had described suspicious behavior by the husband (a fight and an attempt to construct a false alibi) around the time of the crime; and still other witnesses described a history of abuse. *House*, 547 U.S. at 548-53, 126 S. Ct. at 2083-85. After its consideration of all the evidence, the Supreme Court concluded that while the case was not one of conclusive exoneration, "the central forensic proof connecting House to the crime—the blood and the semen—has been called into question, and House has put forward substantial evidence pointing to a different suspect." *House*, 547 U.S. at 553-54, 126 S. Ct. at 2086.

Accordingly, the Supreme Court concluded that "although the issue is close, . . . this is the rare case where—had the jury heard all the conflicting testimony—it is more likely than not that no reasonable juror viewing the record as a whole would lack reasonable doubt." *House*, 547 U.S. at 554, 126 S. Ct. at 2086. In contrast, as explained in this Court's Opinion, and for the reasons just stated, there is simply no reliable evidence that Beach falsely confessed to murdering Nees and that a "pack of girls" are instead responsible for her death.

¶137 Over the last 21 years, Beach has been through one federal habeas proceeding, including an appeal to the Ninth Circuit; two executive clemency proceedings; and two state postconviction proceedings. While he has persistently maintained his innocence throughout these proceedings, he has repeatedly failed to produce any reliable new evidence establishing that fact to the satisfaction of the board or tribunal involved. In its August 20, 2007 decision, the Montana Board of Pardons and Parole aptly observed that, "[u]ltimately, his statement to detectives that he had gone home after the murder and tried to convince himself that he did not do it, chilling as it is, provides what seems to this Board the likeliest explanation of what he is doing still." As the Board further observed, in order to believe Beach's claim that he did not do what his confession says he did, "we would have to believe that every single one of the law enforcement officers was steadfast in lying at the time the confession was taken, through the suppression hearing, through another trip to Montana for the trial, and even now when most have changed careers and

one faces a life-threatening health crisis." To adopt such a belief would require a far more persuasive evidentiary showing than Beach has made here.

## VI. Conclusion

¶138 In conclusion, while I concur in the Court's application of the *Beach I* analytical framework, I do so only for purposes of this case and Beach's claims that are now before us. For purposes of future cases involving substantive or procedural claims of innocence, I would overrule *Beach I* and apply the standards that I have detailed above. Lastly, I agree fully with the Court's analysis and conclusion that Beach's new evidence is not reliable and, thus, that Beach's innocence claims must fail. Opinion, ¶¶ 68-78.

¶139 I concur.


/S/ LAURIE McKINNON


Justice Beth Baker, Justice Jim Rice, and District Court Judge Richard A. Simonton join the Concurrence of Justice Laurie McKinnon.


/S/ BETH BAKER
/S/ JIM RICE

/S/ RICHARD A. SIMONTON
District Court Judge Richard A. Simonton
sitting in place of Chief Justice Mike McGrath

Justice Brian Morris dissents.

¶140 This Court determined that Beach could petition for post-conviction relief, even though such relief was otherwise time-barred, if he could produce new evidence of actual innocence. *Beach*, ¶ 51. We remanded the case to the District Court to conduct an evidentiary hearing. The District Court applied the standards and procedures set forth in *Beach*. The District Court determined that Beach's witnesses at the hearing offered new evidence that demonstrated Beach's actual innocence and granted Beach a new trial.

¶141 We set forth the procedures and standards by which the District Court should evaluate Beach's new evidence in light of his effort to obtain a new post-conviction relief hearing or to be found actually innocent. *Beach*, ¶ 51. These procedures serve as law of the case. This Court has long recognized that when the Court "states in its opinion a principle or rule of law necessary to the decision, such pronouncement becomes the law of the case." *Fiscus v. Beartooth Elec. Coop.*, 180 Mont. 434, 437, 591 P.2d 196, 197 (1979); *see also*, *Federated Mut. Ins. Co. v. Anderson*, 1999 MT 288, ¶ 60, 297 Mont. 33, 991 P.2d 915. The law of the case "must be adhered to throughout its subsequent progress, both in the trial court and upon subsequent appeal" even if the Court "may be clearly of opinion that the former decision is erroneous." *Fiscus*, 180 Mont. at 437, 591 P.2d at 197-98.

¶142 The District Court found the testimony of each of Beach's witnesses to be credible and believable. The District Court observed the demeanor of each witness presented by Beach. The District Court carefully detailed what it found credible about each witness.

The District Court considered the fact that most witnesses had no connection to the town of Poplar, Beach, or Nees, and accordingly, had no motive to lie. The District Court, as the trier of fact, sits in a better position to observe the witnesses and determine credibility than this Court. *State v. Finley*, 2011 MT 89, ¶ 31, 360 Mont. 173, 252 P.3d 199; *Double AA Corp. v. Newland & Co.*, 273 Mont. 486, 494, 905 P.2d 138, 142 (1995). The District Court has presided over at least 35 criminal trials and has experience gauging the credibility of witnesses. I cannot say from this vantage point that the District Court's determination regarding the witnesses' credibility and believability rises to the level of clearly erroneous. *Clark*, ¶ 39.

¶143 The District Court next weighed the evidence that the State presented at Beach's original trial against Beach's new evidence to determine whether Beach had demonstrated that no reasonable juror would find Beach guilty beyond a reasonable doubt. *Beach*, ¶ 48, *Schlup*, 513 U.S. at 331-32, 115 S. Ct. at 869. The Court concludes that the District Court ignored the evidence that the State had presented against Beach in the 1984 trial. ¶ 21. The District Court specifically addressed this concern, however, in its order on the State's motion for stay. The District Court stated, "[i]t is [Beach's] confession that constitutes the entirety of the State's argument. That confession was considered by this court in its Order."

¶144 Beach's confession constituted "the focal point of this whole inquiry." Concurring Opinion, ¶ 85. The State conceded at Beach's trial that no reliable physical evidence retrieved from the crime scene tied Beach to the murder. Concurring Opinion, ¶ 83. The

91

District Court's statement that it had compared the evidence at the hearing against Beach's confession indicates that the District Court properly weighed the State's evidence from Beach's 1984 trial against the new evidence presented at the hearing. *Beach*, ¶ 48; *Schlup*, 513 U.S. at 331-32, 115 S. Ct. at 869.

¶145 The court's weighing of the evidence led it to conclude that no need existed for Beach to have a new post-conviction relief hearing based on the fact that Beach had demonstrated his free standing actual innocence claim by meeting the higher burden of persuasion. *Beach*, ¶¶ 44-45; *Schlup*, 513 U.S. at 315, 115 S. Ct. at 861. The District Court concluded, "[n]o reasonable juror, properly instructed, could have combined that testimony [of Ms. Eagle-Boy] with the testimony of Ms. White Eagle-Johnson, Ms. Smith and Ms. Molar and not had reasonable doubt whether Mr. Beach committed the murder." The District Court followed this Court's instructions on remand from *Beach*, ¶ 51.

¶146 This ruling marks what likely will be the final chapter in the saga of Barry Beach. We oversee a criminal justice system that seeks to resolve a defendant's guilt through processes created and administered by humans. Humans, by nature, are fallible and the processes that humans create share this same fallibility. The system requires that we make the final judgment on the District Court's ruling. Justice Jackson, in a different era and a different context, described the United States Supreme Court's role in reviewing the decisions of a state court: "[w]e are not final because we are infallible, but we are infallible only because we are final." *Brown v. Allen*, 344 U.S. 443, 540, 73 S. Ct. 397,

427 (1953) (Jackson, J., concurring). The District Court scrupulously attempted to comply with its mandate from this Court to consider Beach's alleged new evidence. *Beach*, ¶ 51. I cannot say that the District Court's rulings rise to the level of abuse of discretion, *Beach*, ¶ 14, and, accordingly would affirm the order of the District Court.

/S/ BRIAN MORRIS

Justice Patricia Cotter and Justice Michael E Wheat join the Dissent of Justice Brian Morris.

/S/ MICHAEL E WHEAT
/S/ PATRICIA COTTER